## Newsom, et al. v. Commonwealth.

(Decided October 4, 1916.)

### Appeal from Floyd Circuit Court.

1.  Homicide—Resisting Arrest by Officer—Evidence—Submission to Jury.—Where in a prosecution of an officer and members of his posse charged with the killing of a defendant in a misdemeanor

warrant their defense is that the defendant in the warrant resisted arrest and attacked the party by shooting, but there is evidence tending to show that the officer and his party were not in good faith attempting an arrest under the warrant, but were really seeking under the guise of his office to kill or do bodily harm to the defendant in the warrant, this question should be submitted to the jury.

2.    Homicide—Resisting Arrest—Evidence.—Evidence by one as to what she thought were the purposes of an officer and his party who came to the house after night is incompetent.

3.    Homicide—Evidence at Inquest.—The written, sworn statement of a witness before the coroner's inquest is not contradictory of statements alleged to have been made by the same witness on the same day to the coroner if the written statement does not deal with the facts stated in the conversation, and questions as to that fact were not propounded at the inquest.

A. J. MAY for appellants.

M. M. LOGAN, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

The appellants, Fred and Mack Newsom, were indicted in the Floyd Circuit Court charged with the murder of Charles Akers, and charged with entering into a conspiracy to murder him as a result of which he was killed.

On their joint trial they were each found guilty of manslaughter and have appealed.

A short statement of the essential features of the evidence and of the circumstances leading up to the homicide will be necessary to present the questions to be passed upon.

The appellant, Fred Newsom, in 1915 was a deputy constable of a magisterial district in Floyd County, and at the primary election on August 7th, 1915, presumably in his capacity as an officer, he came into possession of a pistol taken that day from a man by the name of Johnson. Akers was at the election and had a banjo with him and late that afternoon he and Fred Newsom met on the highway and Newsom temporarily exchanged the Johnson pistol with Akers for the banjo, with the understanding that Akers should the next day return the pistol to Newsom's house and get his banjo. The parties lived some three or four miles from each other, and Akers failed the next day to return the pistol, where-

upon Newsom went to Akers' home in his absence and procured the pistol from Akers' wife, telling her that he had left the banjo at the home of Newman nearby. Newsom had left the banjo at Newman's house, but after securing possession of the pistol he went by Newman's house and again got the banjo, so that he was then in possession of both the pistol and the banjo. Thereafter Akers went to see Newsom, and Newsom told him that he thought he (Akers) ought to pay him $2.00 because he had been compelled to go after the pistol instead of Akers returning it as he had promised to do, and, we infer from the evidence, Newsom declined to give Akers possession of his banjo without the payment of the $2.00. Thereafter Akers failing to get possession of his banjo instituted some sort of proceeding before a magistrate and caused to be issued a writ of delivery for it on the 9th day of August, although this writ seems not to have been executed, for we find that as late as the 21st of August, the day of the homicide. Newsom still had possession of the banjo.

After the issual of the writ of delivery, and on the 13th of August, Newsom caused to be issued by the magistrate a warrant of arrest for Akers charged with shooting on the public highway, and he claims to have taken this action upon the complaint of one Bryant near whose house the firing had been done. On the 21st of August this warrant against Akers had not been executed, and some time during that day Akers went to the home of Newsom in his absence and in some way, which is not clear from the record, regained possession of the banjo. That afternoon when Newsom went home and found this out he was angry and upbraided his wife for allowing Akers to regain possession of the banjo. Shortly thereafter Newsom left his home, having with him the warrant charging Akers with shooting on the public highway, and summoned his two brothers, John and Mack Newsom, and John Newman to go with him to arrest Akers. That night at about ten o'clock this party approached the house where Akers lived with his father-in-law, John Cox, and the three Newsoms went up to the house, while it appears that Newman remained a short distance away and never went to the house until after the shooting and was not immediately present when it occurred. As the party approached the house some noise at the gate or the barking of a dog aroused

its occupants. The house is a two-room house with
an open passageway running between the two rooms;
John Cox was occupying one of these rooms and Akers
and his wife the other. Akers hearing the noise on the
outside got up and went out and went back into his room
and informed his wife that he saw something out there
that looked like a man with a white shirt on, but admon-
ishing her not to be frightened, and it does not appear
that after this he ever got back in bed. After Akers
had returned to his room John Cox also went out and
saw the three Newsoms within a few feet of the passage-
way or entrance. He informed them who he was and
asked what the trouble was, whereupon Fred Newsom
informed him that he had a warrant for Akers and asked
if Akers was there. Cox equivocated and told them that
he had not seen Akers since that morning, and about
that time Akers' wife, who was in bed, evidently over-
hearing the conversation, spoke up and said that Akers
had gone over on Beaver that morning and had not re-
turned. Fred Newsom, suspecting that this was not true,
asked Cox if he might search the house for Akers, and
Cox either declined to let him do so or failed to give a
satisfactory answer; whereupon Fred Newsom directed
his two brothers to go around on the other side of the
house, and about the time they got around there the
shooting began and some seven to ten shots were fired;
John Newsom was killed by a shot from a shotgun and
Akers was killed by a pistol shot. The evidence shows
that the shot that killed John Newsom was fired from
about the door of Akers' room, and the shot that killed
Akers was fired through a window of that room, he at the
time being at or near the door.

Without going into details, which we have refrained
from doing because there must be another trial of this
case, it is sufficient to say that there is evidence from
which the jury might have believed that the Newsom
party had formed a conspiracy to kill or injure Akers
and were not in good faith attempting to arrest him;
and on the other hand there is evidence tending to show
that the officer in good faith summoned these men to
go with him to arrest Akers and was in good faith at-
tempting to arrest him; and likewise there is convincing
evidence that Akers at and before the shooting knew
that it was an officer seeking him and that the officer had
a warrant for him, and that he fired the first shot.

The vital question in the case is whether Fred Newsom and his party were in good faith undertaking to arrest Akers, as it was his duty to do, or whether Fred Newsom was using his office as a cloak to aid him in wreaking vengeance against Akers and procured the other members of the party to go with him for that purpose; and this issue was not fairly presented to the jury by the instructions.

Several of the instructions are criticized by counsel, but we see no serious objection to any of them except instruction No. 7, wherein the Court told the jury in substance that if the defendants in good faith undertook to arrest Akers on the misdemeanor warrant and that while so attempting to arrest him, Akers without justifiable cause or provocation began to shoot at the officer's party and they had reasonable grounds to apprehend a design on the part of Akers to do any of them great bodily harm and there was imminent danger of said design being accomplished the defendants had the right to use such force as was necessary to prevent the infliction of such bodily harm.

Plainly that instruction does not embrace the idea which we have undertaken to express above, even if it was otherwise unobjectionable.

On another trial the Court will eliminate instruction No. 7 and will give in lieu thereof the following instruction, to-wit:

You are instructed that it was the duty of the defendant, Fred Newsom, to arrest Akers under the misdemeanor warrant, and that it was the duty of Akers to peaceably submit to arrest; and if you believe that defendant, Fred Newsom, had in good faith summoned Mack Newsom, John Newsom, and John Newman to aid him in arresting Akers under the warrant, and that the defendants, Fred and Mack Newsom, while in good faith attempting to arrest Akers were met with resistance from him to such an extent as to put either of the defendants or John Newsom or John Newman in danger of their lives or great bodily harm, or that the defendants believed and had reasonable grounds to believe that either of the defendants or John Newsom or John Newman were in danger of losing his life or suffering great bodily harm, then the defendants or either of them had the right to use such force as was necessary or as reasonably appeared to them to be necessary to overcome

such resistance, even to the taking of the life of said Akers, and you should find the defendants not guilty.

There are several objections to the admission of evidence against the defendants which it is unnecessary to consider in detail. On another trial the court will not permit the widow of Akers to say what she thought were the purposes of the party when she heard them talking to her father, or that she thought that they were following Akers after the banjo.

Likewise the Court will exclude the written evidence of John Cox given before the coroner; the coroner, Bentley, had testified for the defendants that in a conversation with Cox the day after the homicide Cox had told him (Bentley) that Akers had fired the first shot, and on cross-examination of Bentley the Commonwealth was permitted to read the sworn statement of Cox made before Bentley, the coroner, on that same date. The sworn statement on its face shows that it did not deal with the question as to who fired the first shot and there is nothing in it to indicate that any such question was asked Cox by the coroner at the inquest. Bentley had testified as to a conversation had with Cox and not as to what Cox had stated in his evidence before the coroner. It was not contradictory of Bentley's testimony even if it had been otherwise competent.

The judgment is reversed with directions to grant the appellants a new trial and for further proceedings consistent herewith.