## Ferrell v. Commonwealth.

(Decided June 15, 1917.)

### Appeal from Fayette Circuit Court.

1.  Criminal Law—Failure of Accused to' Testify—New Trial.—The failure of the defendant, when on trial for a criminal offense, to testify for himself, though caused by the advice of the two attorneys who defended him by appointment of the trial court, did not entitle him to a new trial, in the absence of a satisfactory showing that such attorneys by reason of their lack of legal learning, skill or experience were incompetent to properly perform the service required by their appointment and, in fact, did not do so.

2.  Criminal. Law—Counsel for Accused.—If the defendant in an indictment charging him with a felony be unable to procure counsel to make his defense or refuse to do so, the law makes it the duty of the trial court to appoint a competent attorney to defend him;. and when the appointment is made by the court and accepted by the appointee, and the latter performs the service thereby required of him, in the absence of a positive showing to the contrary, the presumption must be indulged that he was competent to perform the required service and, also, that such service was faithfully and efficiently performed, both in the matter of advising the defendant and in otherwise conducting his defense.

3.  Criminal Law—Failure of Accused to Testify.—The law accords to the defendant in a criminal prosecution the privilege of testifying in his own behalf.  Therefore, he may or may not do so; but the law does not permit his failure to testify to be used against him or even commented upon.  The law does not, however, make it the duty of the trial court to inquire of the accused whether he

wishes to testify, or to see that he or his counsel exercise good judgment in determining whether or not he will do so. And, if the defendant by advice of his counsel, declines to avail himself of the right to testify in his own behalf, accorded him by the law, it will be presumed from counsel's familiarity with the case and his duty to his client that he had a good reason for giving such advice.

4. Criminal Law—Self Defense—Instructions.—Where upon a trial of the accused for the crime of murder, there is uncontradicted evidence showing that he did the killing, and both a motive for the crime and malice in its commission; and in addition, it was established by the testimony of eye witnesses to the killing and the physical facts manifested by the character and location of the wounds upon the body of the deceased, that the killing was wholly needless and inexcusable, the refusal of the trial court to give an instruction on the law of self-defense was not reversible error.

W. H. TOWNSEND and JESSE L. MILLER for appellant.

C. H. MORRIS, Attorney General, and D. O. MYATT, Assistant Attorney General, for appellee.

Opinion of the Court by Chief Justice Settle— Affirming.

The appellant, Joe Ferrell, a man of color, was jointly indicted with five other colored men in the Fayette circuit court for the murder of Thomas Kirkpatrick, September 25, 1916. Upon his separate trial the jury returned a verdict of guilty of murder, as charged in the indictment, and fixed his punishment at death. His motion for a new trial having been overruled, he was duly sentenced by the circuit court; and from the judgment of conviction he now prosecutes this appeal.

The homicide in question occurred September 25, 1916, at night, on South Broadway street near its intersection with Chair avenue, in the city of Lexington. It appears from the record that the appellant is a resident of Wilmore, Jessamine county, and that he and his five co-defendants were members of a crew employed on a construction train of the Southern Railway Company; that on the night of the killing they came to Lexington and about nine-thirty o'clock, together entered the saloon of Gast & Company, on the corner of South Broadway and Christy streets, a block from the scene of the killing, for the purpose of obtaining drinks. When they entered the saloon the deceased, Thomas Kirkpatrick, a white man, was in the saloon. Kirkpatrick had been drinking heavily and in fact was so drunk that he walked with difficulty. It appears from the evidence that after en-

tering the saloon appellant and his five companions stepped to the bar and each took a drink, and that Kirkpatrick, in his drunken condition, staggered or bumped against one of them. Jesse Morgan, a witness for the Commonwealth, who was in the saloon at the time and whose statements are not contradicted by any other witness, testified as to what then occurred as follows:

"Directly they came in. He (Kirkpatrick) was standing talking to somebody and he fell up against them. I don't know who he was talking to, but he was talking to somebody and fell over against them and they said, 'Damn you, stay off me, don't fall on me,' and he said, 'I am not afraid of you'; and they were talking and one word brought on another and about a dozen words passed, and then these darkies went in the rear room and were all bunched up together in the back room, and they left him inside of the barroom or the partition, the partition door was wide open and one of them said, 'We will get him when we get him on the outside.'"

When testifying as a witness on appellant's trial, Morgan identified him as the man who said in the saloon, "We will get him when we get him on the outside." At the beginning of the altercation, W. J. Rice, the bartender, was in the back part of the saloon, but upon hearing the disturbance he came to where the parties were and told them that he could not permit that kind of conduct in his place of business, and then took Kirkpatrick and led him out of the saloon through the front door, which opens on Broadway street. Immediately after Kirkpatrick was put out of the saloon, appellant and his companions, who were at that time, by order of Rice, in the back room, hurriedly left the saloon through a side door leading from the rear room of the saloon on to Christy street, and in the same hurried manner proceeded along Christy street into Broadway. When they turned the corner of the saloon, entering Broadway, Kirkpatrick, who upon leaving the saloon by the front entrance had walked down Broadway, had then reached a point more than half a block from the saloon. Appellant and his companions, upon reaching Broadway, rapidly walked in couples in the direction taken by Kirkpatrick, who was all the time in their view. Appellant and one of his companions composed the advance couple. The witnesses Brock, Terrell and Bosworth, all saw the appellant and his companions walking rapidly, and one or more of them say, almost running, in the direction of Kirkpatrick. Terrell testified that he was walking down Broadway in the direction

taken by Kirkpatrick; that he saw him overtaken by the advance couple under the shed of McCrystal's grocery, near the corner; that one of the men was leaning up against the wall, but in the language of the witness, "the other man was working on the fellow. I thought he was hitting him with his fist, but on a little closer look I saw he was using a knife." According to Terrell's further testimony, when he got near enough to attract the attention of appellant and his companions they ran down Chair avenue. Kirkpatrick only lived a few minutes after receiving the wounds and died either while they were putting him in the ambulance or on the way to the hospital. Bosworth, another witness who saw the killing, was in the saloon when it was entered by appellant and his companions. He testified, as did Morgan, to the occurrence in the saloon, agreeing with both Morgan and Rice, the bartender, that when Rice put Kirkpatrick out at the front door he told the appellant and his companions to leave by the rear door, at which time Bosworth, as did Morgan, heard one of them make the remark, "We will get him on the outside." The witness further testified that he went out the front entrance as Kirkpatrick left, and saw him going down Broadway followed by appellant and his companions; that he saw them catch up with him and gang around him. From the point at which he viewed the scene he was unable to tell what they were doing, but shortly after they had surrounded Kirkpatrick, they broke and ran down Chair avenue, after which Kirkpatrick walked a short distance from where they left him to Jones' restaurant and there fell.

Dr. L. R. Gordon, who is a physician and also the coroner of Fayette county, testified that he made an examination of the wounds received by Kirkpatrick; that they were eleven in number, all in the back, and that these wounds were cuts or stabs made by a knife, at least two or more of them being sufficient to cause death. It further appears from the evidence that appellant and his companions made their escape from Lexington that night, but were arrested in Wilmore, Jessamine county, early the next day; that when appellant was arrested, the constable making the arrest, found on his person a knife upon which there was blood, and also blood on his clothes. The identification of appellant and his five codefendants as constituting the party in the Gast saloon and later engaged in the attack upon Kirkpatrick was complete. Appellant did not testify upon the trial of the case nor did any of his co-defendants. He, however,

introduced two or three witnesses who testified that Kirkpatrick had the reputation of being a quarrelsome man while under the influence of intoxicating liquors. It is believed that the outline here given of the evidence presents all the salient facts leading to and connected with the killing of Kirkpatrick.

The same grounds urged by appellant for a new trial in the court below are now relied on by his counsel for a reversal of the judgment of conviction. They are two in number: (1) Because appellant, upon the advice of his counsel, did not testify in his own behalf on the trial in the circuit court. (2) That the court erred in failing to instruct the jury on the law of self-defense.

The affidavit of appellant, filed in the court below in support of his motion for a new trial, admits that he alone inflicted the wounds which caused the death of the deceased, but claims that they were inflicted in his necessary self-defense, and recites the testimony he would have given in support of that claim had he testified in his own behalf, and which he would yet give, if granted a new trial. He also states in the affidavit that he desired to testify in his own behalf and so informed his attorneys during the trial, but that the latter advised him not to do so, and that in obedience to their advice he did not offer to introduce himself as a witness. It is virtually conceded in the brief of appellant's counsel that this ground for a new trial would be entitled to little weight if the attorneys representing him on his trial had been selected or employed by him, but insisted that this rule should not apply where, as in this case, the attorneys were not of his selection or employment, but were appointed by the court to make defense for him. We are unable to perceive any reason for this distinction. It is not claimed by appellant, nor does it appear from anything contained in the record, that the attorneys appointed by the court to defend him were not qualified to perform the service required of them; and in the absence of an objection by appellant to their appointment, when made by the court, and of evidence that the objection was based upon a satisfactory showing that they were incompetent, or for some other sufficient reason, unfitted for the task, the presumption will not be indulged that their appointment was unauthorized or improper. The law imposed upon the trial court the duty to appoint an attorney to defend appellant, if he was unable or refused to do so, and we must infer that that duty was performed by the court for appellant because of his inability to obtain the serv-

ices of an attorney. Indeed, the court did more than was required of him by the law. It appointed two attorneys to defend the appellant, whereas the law required the appointment of but one. It is not urged against these attorneys that either of them was deficient in legal learning or lacking in skill or experience, and the record shows that they faithfully and, with the usual skill, performed to the end the duties required of them as counsel for appellant. If, as claimed by the latter, counsel advised him not to go upon the witness stand and testify in his own behalf, we must assume from counsels' familiarity with the case and their duty to their client, that they had a good reason for giving such advice, and we do not find in the record an affidavit or other statement from them indicating that they made a mistake in advising appellant not to make of himself a witness.

It should further be remarked that no claim is made by appellant that the court knew of his desire to testify as a witness in his own behalf, or of the advice to him of his lawyers not to do so. He might have asked the advice of the court in the matter, but this was not done, and while the law extends to one accused of crime the right to testify in his own defense, it does not make it the duty of the trial court to inquire of the accused whether he wishes to do so, or to see that he or his counsel exercise good judgment in determining whether or not he will testify.

Although the framers of our Criminal Code of Practice attempted by section 271 thereof to set forth the grounds for which a new trial may be granted, they evidently did not have in mind that the failure of the accused to testify in his own behalf, though resulting from the advice of his counsel, should be accepted as a ground for a new trial. Obviously, the facts in the possession of the accused and to which he claims he would have testified if he had gone upon the witness stand, cannot be regarded as newly-discovered evidence, treated by sub-section 6 of section 271 as a ground for a new trial; nor can it be said to come under the provisions of sub-section 7 of section 271, which declares that if from the misconduct of the jury, "or from any other cause," the court be of opinion that the defendant has not received a fair and impartial trial, a new trial may be granted him. The words "or from any other cause" mean and can only refer to a cause for which the defendant is not himself responsible. They cannot embrace a cause resulting, as

in this case, from his own fault or the mistake of his counsel.

The novelty of the appellant's contention in this behalf has induced us to consider it from every point of view urged by his counsel in argument, but we have been unable to find any reasonable ground for sustaining it, nor have we been referred to, or been able to find, any authority requiring us to do so. It is, therefore, our conclusion that its rejection by the circuit court as a ground for the new trial asked was not error.

Appellant's second and final contention, that the failure of the circuit court to instruct the jury on the law of self-defense entitled him to the new trial moved for, is, in our opinion, also without merit. Such an instruction was not authorized by the evidence. In other words, the evidence contained in the record before us clearly shows that in the saloon, a few minutes before the commission of the homicide, appellant became without just cause violently incensed at the deceased because of the latter accidentally bumping or falling, in his drunken condition, upon him or one of his companions. As appellant was the only one of the party who seemed to take offense at this unintentional act of the intoxicated man, it is fairly apparent that he was the person against whom he fell. At any rate, he immediately cursed deceased, whose only reply was that he was not afraid of him. At that juncture the brewing difficulty was stopped by the bartender, who ordered appellant and his companions into the rear room and put deceased out on Broadway, through the front door. While the bartender was in the act of putting deceased out of the saloon and when or before he reached the front door for that purpose, appellant, speaking to his companions and in the hearing of others who were in the front room of the saloon, made the threat that they would get deceased on the outside of the saloon. This threat was most significant in view of what immediately followed, as it was executed by appellant after deceased left the saloon and within a square thereof. As previously stated, appellant and his five companions left the saloon by the rear door, which opened upon Christy street, and upon reaching that street they rushed at once around the corner of the saloon to Broadway, where they obtained a view of deceased, whom they followed at a rapid pace, almost a run, until they overtook him near the intersection of Broadway and Chair avenue, at which point, appellant, who with one companion was in advance of the others, was seen by one of the only

two eyewitnesses besides himself and his companions, to begin cutting deceased in the back, from which he did not desist until the witness mentioned reached the place of the cutting, when he and all of his companions fled and made their escape. No witness testified that deceased made the attack at the place of the killing, but if he had done so, it would not have justified or excused the infliction of the wounds that were given him by appellant, as in his intoxicated and helpless condition, appellant alone or with the assistance of his companions, could have restrained and prevented him from inflicting any injury upon him or them, by merely holding and overpowering him. So, in any view of the case, the killing was a needless one. At no time did appellant have reasonable grounds to apprehend danger to his life or person, from his unarmed and helpless victim. It is equally manifest that the killing of deceased was not done in sudden heat or passion or in a sudden affray; for if it be conceded that the bumping of deceased against appellant in the saloon was sufficient to provoke the anger then exhibited by the latter, the interval between that act and the killing gave sufficient time for appellant's anger to cool. It is as manifest that the killing was not manslaughter as that it was not done in self-defense. It was, therefore, murder, the element of malice being shown by the anger of appellant in the saloon and the threat then made that he and his companions would get him after he left the saloon, followed by the immediate and deliberate tracking and running down of deceased, and the infliction upon him by appellant of the wounds of which he died.

Besides that uncontradicted evidence, showing the inexcusableness of the killing referred to, are the additional and more potent physical facts furnished by the eleven wounds inflicted upon the person of deceased by appellant, all found in his back, which strongly conduces to prove that he was attacked from the rear when overtaken by appellant, for he could not first have attacked appellant without facing him and receiving some of the knife wounds in his front.

In the several cases cited by appellant's counsel in support of their contention that the jury should have been instructed as to the law of self-defense, reversals were adjudged for failure to give such instruction, because there were no eye-witnesses introduced on the trial who saw the homicide committed or saw the parties after they

met on the occasion when the killing occurred; it being held that in such state of case it is the duty of the trial court to give the law applicable to murder, manslaughter and self-defense, in order to meet any state of fact the jury might find, from the circumstances in evidence, to have existed. The case before us is not of that character. Here there was uncontradicted evidence proving both a motive and malice on the part of the appellant, also the uncontradicted testimony of eye-witnesses to the killing; and, in addition, physical facts furnished by the peculiar location of the wounds inflicted upon the person killed, from all of which it was conclusively made to appear that the killing was not done in self-defense or in sudden heat or passion, but with malice aforethought and under circumstances that made the homicide murder.

On a trial for homicide an instruction on self-defense is not proper where no such issue was raised by the evidence. Likewise, where the testimony of an eye-witness or witnesses, corroborated by physical facts or strong circumstances, shows a premeditated murder, and no evidence is introduced in behalf of the defendant conducing to prove that the killing was done in his self-defense, an instruction on self-defense would be unauthorized. Bast v. Commonwealth, 124 Ky. 747; Lawson v. Commonwealth, 152 Ky. 113; McElwain v. Commonwealth, 154 Ky. 242; Frasure v. Commonwealth, 169 Ky. 620. A converse statement of the above rule will be found in the following excerpt from the opinion in Slagel v. Commonwealth, 81 Ky. 488:

"The rule is, where there is any evidence tending to support any view of the case embraced by the position of the prosecution or the plea of the accused, that it is the court's duty to instruct the jury with reference thereto; but where there is no evidence in the case, or the evidence is of such character as to leave no room for doubt that any shade of a given phase of the law is not applicable to the case, it ought not to be embodied in an instruction to the jury. A treatise, abstract, or analysis of the whole law of homicide should not be given in each case, but only so much of the law as applies to the facts of the case under investigation."

The application of this rule to the case we have before us convinces us that the failure of the court to give an instruction on the law of self-defense was not prejudicial to any substantial right of the appellant. By the instructions that were given, the jury were told in what state of case they would be authorized to find the ap-

pellant guilty of murder, or voluntary manslaughter, and advised of the punishment applicable to each of these crimes; also what would authorize a verdict of acquittal, while in and through them, separately and as a whole, ran the admonition to the jury to allow appellant the benefit of every reasonable doubt in the matter of determining his guilt or innocence, or if they found him guilty, in determining the degree of his offense. It will thus be seen that the instructions embraced and gave to the jury all the law applicable to the case.

The severity of the penalty inflicted upon the appellant has led us to consider with great care all the evidence heard, rulings made and proceedings taken in the case; and it is our conclusion that the appellant received a fair and impartial trial and that the verdict of the jury was warranted by the evidence. This being true, notwithstanding the severity of the penalty imposed, it is our imperative duty, in furtherance of justice, to approve the verdict and judgment of conviction. Wherefore, the judgment is affirmed. Whole court sitting.