## Pierson v. Commonwealth.

(Decided May 21, 1929.)

THURMAN B. DIXON, J. MILES POUND and GARDNER K. BYERS for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Oscar Pierson and Raymond Stinnett were jointly indicted for the murder of Earl Baumbach. On his sepa-

rate trial Pierson was found guilty and his punishment fixed at death. He appeals.

As to the following facts there is practically no dispute: The police department of the city of Louisville had received information that a Ford coupe belonging to M. D. Arnold, a traveling salesman, had been stolen in front of the Kosair Hotel on the night of September 24, 1927. On the night of October 2, 1927, Officers Mialbach, Colleen, Lalley, and Baumbach discovered the machine near the corner of Third and Oak streets in the city. In the car were Frank Brown, Raymond Stinnett and appellant. All three of them were arrested and placed in a Dodge touring car, which was then driven towards the police station at Sixth and Jefferson streets. Officers Mialbach and Colleen were on the front seat, and Officer Baumbach, Stinnett, Brown and appellant were on the rear seat. Officer Lalley followed in the Ford coupe, but turned off before reaching the place of shooting and knew nothing of that occurrence. As the Dodge touring car passed the intersection of Fifth and Jefferson streets, several shots were fired. All three of the officers were wounded. Baumbach and Colleen died almost immediately, while Mialbach lingered for a few hours. Baumbach was shot in the chest, the ball entering through the right lapel of his coat.

Harry Buckley, a witness for the commonwealth who operated a garage, testified that, about 11:30 o'clock on the night before the shooting appellant came to his garage in a Ford coupe bearing a Daviess county tag, and drove away with Stinnett. Stinnett had been working there for a few days, and appellant had asked him to give Stinnett the job. Frank Brown testified that he had known appellant and Stinnett for six or seven months. He was with them the night of the homicide. Appellant had a Ford coupe. He and appellant first went to Buckley's filling station to get Stinnett about 9 o'clock, but Stinnett was not off from work. Later on they returned for Stinnett. All three of them then went to where Stinnett was staying on First street, where Stinnett changed his shirt. They then went to 1316 West Market street, where Brown lived, and Brown loaned Stinnett a pair of pants. After driving out in the east end for a while they had a flat tire. They were all arrested at Third and Oak streets. At that time they were in Pierson's machine. After being arrested they were placed in the Dodge touring car. While driving along there was

considerable argument about appellant's stealing the car. Pierson said that he did not steal it; it belonged to him. One of the officers (Baumbach) sat on the left side of the rear seat. Then came appellant, then witness, then Stinnett. Before they started on the journey he had seen two pistols wrapped in paper and laying in the back of the Ford coupe. Appellant said he was going to sell them. Neither he nor Stinnett had a pistol that night. Just as they got over the intersection at Fifth and Jefferson streets, appellant raised up in his seat and said, "Fellows, let's go," or, "All right, fellows, let's go," and started shooting. Before that appellant had given witness a gun, and he had put it behind the seat. At the same time he saw appellant fumble in his shirt, and noticed the butt of a pistol which appellant drew from his shirt and began to fire. Appellant had on a brown shirt and not a close sweater. This pistol was presented to him, and he identified it as the one that appellant had slipped to him. Appellant fired the shot that struck Baumbach. The only two pistols he saw was the one handed to him and a big, black 38, which appellant used. When the first shot was fired Stinnett fell over or jumped out. He also went out, or fell out of the car. Both got out on the right-hand side. He then ran to Fifth street, and on Fifth to an alley leading to Centre, and then up Centre street and stood there in the doorway of the garage about three minutes. Then he went up to Third street and then over to Market. He was joined by Stinnett, but they afterwards separated. He and Stinnett then went to Illinois and returned in about 15 days. They then went out West, and after spending some time together were separated. After wandering around there for some time, witness returned about May 1st and surrendered. He learned that appellant had put it on him and Stinnett. If appellant had not brought their names in it, they would never have returned. He did not take or have the Ford coupe in possession and did not turn it over to appellant to keep for him. Stinnett testified that he was working at Harry Buckley's filling station at Clay and Fehr. He had known appellant and Brown for about a year. On the night of the homicide appellant came to the filling station driving a Ford coupe. Brown was with him. He asked appellant whose car it was, and appellant said: "It is my dad's. Me and him are paying for it." On leaving the station

they went to 113 South First street, where he got a clean shirt. He then went to Frank Brown's at 1316 West Market, and borrowed a pair of pants. He had not seen any weapon or pistol that night and did not have a pistol. When arrested one of the officers said that the car was stolen, and that they had been looking for it a long while. He was talking to appellant. He was seated on the right-hand side partly on Brown's knee. Next to Brown was appellant, and next to appellant was an officer (Baumbach). During the ride the officers were cursing, and spoke to appellant in a very rough manner. Just as they crossed Fifth street appellant pulled a gun and said, "All right, boys, let's go," and started firing. He rolled out of the car. Appellant had a big, black pistol that was pointed to his left. While driving along Brown kept fumbling around him, and he asked Brown in a low voice what he was doing. Brown said, "I am hiding this gun." After jumping out he ran east on Jefferson to Fifth, crossed the street, and ran down the alley between Market and Jefferson to Fourth. Later he saw Brown at Fourth and Market. He stayed in Louisville over Sunday and left Monday, going to Mitchell, Ind. After staying there a while he went to Rockport, Ky. He then left Rockport with Brown and took a trip out West. He returned to Kentucky about December 1st. On cross-examination he stated that he had been with Brown and appellant quite frequently. Brown had never visited him at his home, or brought appellant with him. Appellant had been in his home. Very shortly before the trouble he had seen appellant. Appellant drove up to the curb and he told appellant to drive him around to Harry Buckley's filling station. On the night of the trouble he did not see any pistol wrapped in newspaper. It had been a couple of years since he had had a pistol. He was locked up for vagrancy and his lawyer took his gun. Officers Hatzell and Garvey testified that they arrested appellant at Fischer's Packing Plant on October 4th. Appellant was wearing white clothes like a uniform. Garvey asked appellant where his locker was. Appellant said, "Haven't got nothing in the locker." Garvey told him that he did not want to go down with a uniform like that, and appellant consented to open the locker. Appellant said, "There is nothing in there at all." Garvey then opened the locker and found a magazine automatic pistol wrapped up in a handkerchief under some papers.

In the meantime appellant was eating a piece of cake. He mentioned the names Baumbach and Colleen and appellant like to have choked. It was necessary to take him to the faucet and clear his throat. On being brought to headquarters, he was asked where he was Saturday night. He replied that he left home Saturday evening at 4 o'clock on a hike to Shelbyville, and it being late he slept in a haystack that night. Joseph Lauffer testified that he was present at the time of the shooting. He pulled his car into the curb. When the Dodge car got 15 or 20 feet west of Fifth street there came a volley of shots. None of the persons in the car got out of the car before the shooting.

On the other hand, appellant testified as follows: He had been working for the Fischer Packing Company about three months, and lived with his parents. He had known Stinnett for about a year. He did not know Brown as Brown, but knew him as Rogers, and had been acquainted with him for three months. The last Wednesday night in September Frank Brown picked him up at Second and Jefferson streets, and took him to Buckley's place to see Stinnett. On Thursday night Stinnett and Brown came to his house and left the machine there. The machine was a Ford coupe. They told him they were going out of town and wanted him to keep the machine because Stinnett had no place to keep it. He kept the car in front of his house. He paid no attention to the license plate on the car. He did not see Brown on Friday afternoon. He was at the Fischer Packing Company plant. On Saturday night he met Brown at the Capital Hotel according to an agreement. He brought the Ford coupe there. They drove to Buckley's garage. They picked up Stinnett about 11:30. They drove to Stinnett's rooming place on First street and Stinnett changed his shirt and pants. They then drove to South Louisville. Coming back they stopped at Third and Oak streets. The police came up and said, "Come on, get in the machine with us." They did not curse or use any boisterous language. They searched him and found no weapons on him. He had no weapons. At the time he wore a slipover sweater. As they rode toward police headquarters Baumbach was on the left-hand side, Brown was next, and he was next to Brown with Stinnett on his left. They all remained in those positions until the shooting occurred. The officers did not tell him

what they were arrested for. When they left the intersection at Fifth and Jefferson streets Stinnett said, "Let's go." He thought there was a wreck or something. He gave Stinnett a shove and jumped out on the right-hand side. When he got a few feet away the shooting began. He ran north on Fifth street back of the Inter-Southern Building to Fourth street, down Fourth street north to the River Road. He walked up the River Road to Preston, and on Preston to Jefferson, and up Jefferson street west to Thompson's restaurant. He ate a little lunch and stayed around there until 7 o'clock in the morning. He then went home about 9 o'clock. He stayed at home until afternoon, then went downtown to the Savoy Theater. On Monday he went to work at 6 o'clock and worked there all day. He returned to work Tuesday morning and was arrested about 9:30. He changed his clothes on the third floor in the dressing room. He put on the same sweater he had on Saturday night. His locker was not locked. He had an automatic pistol in the locker. He owned the pistol about six months. It was a 32-caliber. The two notches on the pistol were there when he got it. He did not eat cake or become choked. He was then taken to the city hall and questioned. He told the officers who were in the car that he did not admit that he was in the car at the time of the shooting. He gave the officers the names of Stinnett and Rogers, and they knew Brown by it. He did not see any pistols that night. He did not see either Brown or Stinnett that night. He had seen Stinnett with a pistol about four weeks before. Stinnett told him that he had stolen it in a house on Bardstown Road. It was a 38 Smith & Wesson side-wheeler, blue steel. He never raised up in the automobile and said, "Boys, let's go." He did not draw a pistol or fire a pistol. He owned no other pistol except the automatic. That pistol was at home. He never showed Brown two pistols wrapped up in newspaper, or told him that he was going to sell them. On cross-examination he stated that he could not tell who shot the man for he did not know. If he previously stated that Stinnett did it, it was under a threat. He admitted making the statement. He said that it was forced on him. If he made any statement to police officers that Brown had a 38 pistol and hid it behind the seat, it was under a threat. He did not steal the car. Brown got the car, and either Stinnett or Brown did the shooting. He

kept the automatic at the Fischer Packing Company plant for fear that his kid brothers might get hold of it and shoot themselves. When he had it at home he usually kept it in the basement. He usually carried the pistol to his working place on Monday morning and kept it there until Saturday. He had not seen Brown over five times the week the shooting occurred. He did not know Brown's sister or his mother. He had not gone with Brown to the place where his sister worked, or brought her back in the machine. He did not teach her or any girl to drive an automobile. The night of the tragedy he was driving the car. He did not learn that the men were killed until the next afternoon. When he learned it he did not go down and give himself up because he did not want to be framed. When he heard the shots he thought the officers were shooting at him. Mrs. Margaret Briscoe testified that she was just leaving the Standard restaurant on Fifth street. It is on the north side of the alley between Market and Jefferson streets, and back of the Inter-Southern Building. She heard the shots. She thought it was a blow-out. She stepped back to talk to a friend and saw two boys running north on Fifth street and turn in the alley. The boys were not together. One was a little thinner and taller than the other. As far as she could remember, the one in front had on a dark sweater. The one in the rear had on a cap and she did not think he had on a coat. Whether the boy had on a sweater or just a shirt she did not know. She knew that he did not have on a coat. The records of the Fischer Packing Company showed that on Friday, October 1st, appellant punched the clock at 5:35 p. m. Mrs. Edna Kessler testified that during the week prior to the shooting she saw a Ford coupe drive up in front of the Pierson home. There were two young men in the car, but she did not know their names. After that she saw the car standing around in front of the house. It was there more than one day. Russell Pierson, appellant's brother, testified that, prior to the shooting, appellant was off one afternoon and Stinnett came to see him in a Ford coupe. There was testimony by an inmate of the jail that Frank Brown stated that it was fixed up between him and Stinnett that if either of them got caught the other one must try to clear him. There was also evidence that on Brown's return to the jail after testifying he said, "I know I am a dirty rat coming back here and

trying to put it all on Pierson, but I'm going to try to save my buddy." In rebuttal Brown denied stating that it was fixed up between him and Stinnett that if either of them got caught the other one must try to clear him. He admitted that he said: "I might be a rat, but I could not see an innocent man suffer. I came back to tell the truth." It was stipulated that Roscoe Delosier would, if present, testify that there was stolen from his residence several weeks prior to October 2, 1927, a 38-caliber six-shooter side-wheeler pistol. In rebuttal Mrs. Maud Humphrey testified that she was a sister of Frank Brown. Appellant knew her and knew Frank. He had come down from the Axton Fischer Packing Company and driven her home on two or three different occasions. She tried to drive and appellant showed her the difference between a Dodge and a standard shift. Appellant also knew her mother personally.

The first ground urged for a reversal is that the court did not give the whole law of the case, in that it failed to instruct the jury that, if they believed from the evidence the shot which killed Baumbach was fired by Brown, appellant should be acquitted. The argument in support of this position is this: Brown not having been indicted as principal, appellant could not be convicted as an aider and abettor of Brown, which the jury might have done in the absence of such an instruction. It must not be overlooked that the instructions did not author- ize appellant's conviction as an aider and abettor either of Stinnett or of Brown. On the contrary, the sole issue submitted to the jury was whether they believed from the evidence beyond a reasonable doubt that appellant "willfully, feloniously and with malice aforethought, shot Earl Baumbach with a pistol," accompanied by a further instruction that if there was a reasonable doubt of appellant's being proven guilty he was entitled to an acquittal. In other words, they were not authorized to convict unless they believed that appellant fired the fatal shot, and not then, if they entertained a reasonable doubt as to his guilt. Since under the given instructions appellant was entitled to an acquittal if any other person, including Brown, fired the fatal shot, it was not necessary to give a separate instruction singling out Brown and telling the jury that they could not convict if he fired the fatal shot. Hence, the failure to give such an instruction was not error.

The further point is made that both Brown and Stinnet were accomplices, and their evidence was not corroborated by other evidence sufficient to connect appellant with the commission of the offense. Section 241, Criminal Code, provides: ''A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show that the offense was committed, and the circumstances thereof.'' In construing this section we have held that the mere fact that one is charged with a crime in connection with another does not make him an accomplice. Levering v. Commonwealth, 132 Ky. 666, 117 S. W. 253, 136 Am. St. Rep. 192, 19 Am. Cas. 140. On the contrary, whether one is an accomplice must be determined from the facts, and in order to make him such his criminal participation in the crime charged must be shown by the evidence. Anderson v. Commonwealth, 181 Ky. 311, 204 S. W. 71. In determining whether one is an accomplice or not, the test is whether he so participated, aided, or abetted in the commission of the particular offense as to authorize his conviction either as principal, or aider and abettor, if he himself were on trial. Where there is no conflict in the evidence, the question is one of law for the court; but if the participation of the witnesses is in dispute from the testimony or circumstances of the case, the question is for the jury under appropriate instructions. Fryman v. Commonwealth, 225 Ky. 808, 10 S. W. (2d) 302. Though Brown, Stinnett, and appellant each denied any participation in the offense, the following facts are disclosed by the record: All three were found in a stolen automobile. They were under arrest and being conducted to police headquarters. As the car in which they were riding passed the intersection of Fifth and Jefferson, several shots were fired, and three officers were killed. It is not probable that they killed themselves. There was evidence that the shots were fired before either Brown, Stinnett, or appellant got out of the car. While Brown and Stinnett fled, and appellant remained there was also evidence that appellant falsely claimed to have been in the country at the time of the homicide, and not to have known Brown, his sister or mother, and that he had nothing in his locker at the time of his arrest. The situation thus presented is one where practically the

same evidence tending to show that Brown and Stinnett were accomplices also tended to connect appellant with the crime. In the circumstances it would be just as proper to say that appellant was guilty as a matter of law, as it would be to say that either Brown or Stinnett was an accomplice as a matter of law. In view of the conflict in the evidence, we conclude that the court properly submitted to the jury the question whether Brown or Stinnett were accomplices, as well as the question whether their testimony was corroborated by other evidence tending to connect appellant with the commission of the crime.

Another contention relied on is that the court erred in permitting the commonwealth to read appellant's affidavit for a continuance, and cross-examine him with reference to certain statements therein made. The basis of this contention is that not only was the continuance refused, but the court declined to permit the affidavit to be read to the jury, and that being true the affidavit was out of the case for all purposes. In the course of his testimony appellant purported to give the whereabouts of himself and companions throughout the evening preceding the homicide, detailing one movement after another. In his affidavit for a continuance he swore that Douglas Rhea and Louis Lucot, if present and testifying, would state that about 11 o'clock on the night before the killing they were present, and in company with appellant and Raymond Stinnett and Brown at 1234 East Main street, in Louisville, at which place a poker game was in progress, and that Raymond Stinnett had in his possession and was exhibiting and undertaking to pawn a pistol, said pistol being a 38-caliber, six-shooter sidewheeler; that he did not secure a loan on said pistol, but left the place with it in his possession. Appellant further swore "that the evidence that they would give in his behalf on the trial of this case would be the truth as he verily believed." Under our Code a witness may be impeached by showing that he has made statements different from his present testimony. Section 597, Civil Code. If voluntary it is immaterial when, where, or in what form the contradictory statement was made. Thus it was held in Ohio Valley Mills v. Louisville Ry. Co., 168 Ky. 758, 182 S. W. 955, that a witness may be impeached where the proper foundation has been laid by proof of contradictory statements, by the testimony of the stenographer who took his deposition although the deposition

has not been filed in the case. If appellant had merely stated in his affidavit what the absent witnesses would testify to, a different question would be presented; but as he went further and stated in substance that the evidence that the absent witnesses would give would be the truth as he verily believed, he in effect made the statements contained in the affidavit his own, and the affidavit after appellant had been given an opportunity to explain it was admissible for the purpose of impeachment. Rains v. Commonwealth, 226 Ky. 173, 10 S. W. (2d) 643.

Over objection of appellant, Capt. Yarberry, chief of detectives, testified as follows: Stinnett and appellant were brought before him in the city hall. Stinnett sat on one side of the desk, and appellant on the other. Stinnett was asking appellant to tell the truth about the tragedy. Appellant had refused to say anything about it. Finally Stinnett asked if he could go on the other side of the desk and talk to appellant. On receiving permission, Stinnett put his arm around appellant's neck, knelt down, and begged him for some time. Among other things, Stinnett said to appellant: ''You have killed three men, don't take me with you, I have a wife and baby, and I want to live, for you know I had nothing to do with the killing, that you came by the garage where I was at work and took me away from my work and got me in this trouble.'' During the time he was kneeling down Stinnett was crying most of the time. Finally Pierson said, ''I will clear you when I get before a jury if I have to go to the electric chair for doing it.'' While on the stand appellant admitted that Stinnett said something to him, but denied making any reply. It is apparent that the reply claimed by the commonwealth to have been made by appellant to Stinnett's remark did not carry as much weight as his failure to deny the direct charge that he had killed three men. It is argued therefore that the case is simply one of admission by silence, and that the evidence was improperly admitted, as the circumstances were such as not to call for a reply. It is true that many courts have adopted the rule that a person while in custody under a criminal charge has the right to remain silent as to the crime, and all the circumstances connected with it, and is not called upon to reply to or contradict any statements made in his hearing, and no inference against him is warranted by his failure to deny the truth of such statements. Commonwealth v. McDermott, 123 Mass. 440, 25 Am. Rep. 120; State v. Diskin, 34 La.

Ann. 919, 44 Am. Rep. 448. State v. Kelleher, 201 Mo. 614, 100 S. W. 470; Denton v. State, 42 Tex. Cr. R. 427, 60 S. W. 670. On the other hand, there is strong support for the rule that the fact that declarations charging a person with crime, not denied by him, were made while he was under arrest, does not affect their admissibility as implied admissions. Spencer v. State, 20 Ala. 24; People v. Amaya, 134 Cal. 531, 66 P. 794; State v. Pratt, 20 Iowa, 267; Kelly v. People, 55 N. Y. 565, 14 Am. Rep. 342. Following the latter rule, we held in Jackson v. Commonwealth, 100 Ky. 239, 38 S. W. 422, 1091, 66 Am. St. Rep. 336, that voluntary conversations between the person accused of crime and his accomplice were competent evidence, though had while confined in jail. It is true that in Merriweather v. Commonwealth, 118 Ky. 870, 82 S. W. 592, 4 Ann. Cas. 1039, 26 Ky. Law Rep. 793, we held that, on a separate trial of one of several persons charged with murder, evidence of statements made by the others while in custody, and in the presence of defendant, to which he made no response, was not admissible as to defendant's guilt. In that case, however, the court laid stress on the fact that the accused was manacled, was being hurried to jail on a charge of murder, was surrounded by a large crowd, and that no part of the conversation was addressed to him. Shortly after that decision the question arose in Finch v. Commonwealth, 92 S. W. 940, 29 Ky. Law Rep. 187, and we there held that a remark to a person charged with murder by one jointly indicted with him, while both were in custody, importing that the accused was guilty of the crime, as well as himself, to which the accused made no denial, was competent evidence; the circumstances being such as to call for a denial. In reaching this conclusion the court said: "It is insisted that this evidence was not competent under the rule announced in Merriweather v. Commonwealth, but we do not think that is true. The appellant heard Holland's statement, and he certainly understood it. He had ample opportunity to express himself concerning the statement, and the circumstances were such as to call for a denial of them, if they were not true." The facts of the case under consideration are practically the same. It is true that both Stinnett and appellant were in custody, but appellant was not in fear of his safety, nor was he subjected to any threats, intimidation, or pressure of any kind. Stinnett was jointly indicted as an accomplice. His remarks were not made

merely in the presence of appellant, but were addressed to him. Speaking to appellant he said, "You have killed three men." The charge was simple, direct, and certain, and not only must appellant have understood and comprehended its meaning, but he had ample opportunity to express himself concerning the accusation. We are therefore constrained to the view that the circumstances were such as to call for a denial, if the accusation was not true, and that the court did not err in permitting the evidence to go to the jury.

The last ground urged for reversal is that the court erred in refusing a new trial on the ground of newly discovered evidence. In support of this ground appellant filed his own affidavit showing diligence, together with the affidavits of P. B. Fireline and H. Schneider. Fireline's affidavit was to the effect that he was present at the time of the shooting, in company with H. Schneider, on the east side of Fifth street, near the alleyway in the rear of the Inter-Southern Building. His attention was attracted to an automobile moving west on Jefferson street. Soon after observing the moving car, a noise was heard and a voice rang out with some words that he did not understand. Immediately following the words he observed that a man left the car at which he was looking, and immediately upon the person leaving the car he heard the report of a pistol or gunshot, and saw the flash of light from the pistol which was fired inside the car. The man who ran from the car was a tall, slender, spare-made man, wearing a cap and sweater; that he rushed at great speed toward and into the alleyway just at the rear of the Inter-Southern Building, and stumbled and almost fell near where the affiant stood. Schneider's affidavit is to the effect that he was present on the occasion in question with Fireline. As Fireline walked away his attention was attracted by the report of a gun or pistol. He immediately turned and looked south on Fifth street in the direction of Jefferson street, and observed a man running in the direction where he was standing. Before he reached him the man turned in an alleyway in the rear of the Inter-Southern Building. It is suggested that the new trial was refused on the ground that this evidence is merely cumulative. It must not be overlooked that appellant's whole defense was that none of the shots were fired by him, but that all were fired after he got out of the machine. As the case was tried the only witness

who so testified was appellant himself. It hardly can be said that newly discovered evidence is merely cumulative, when it is the only evidence corroborating the accused and giving support to the only defense he has. Looking at the question in the light of all the circumstances, we are constrained to the view that the newly discovered evidence was so material and important as to require that appellant be given a new trial.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.

Whole court sitting.