## Cook v. Commonwealth.

(Decided January 31, 1930.)

614

A. J. MAY, EDWARD L. ALLEN and JOE HALL for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

About 9 a. m. Thursday, November 22, 1928, some one slew A. J. Thornsberry. Miles Bates Sr., Miles Bates, Jr., Joe Martin, Ray King, Albert Cook, Seymour

Slone, and Seland Cook were charged by indictment with having done this murder pursuant to a conspiracy formed for that purpose. Upon his separate trial Albert Cook was convicted of manslaughter, and his punishment fixed at 21 years in the penitentiary, and, his motion for a new trial having been overruled, he appeals.

Some one was operating a moonshine still near Bates branch of Beaver creek, in Knott county, just below what is known as "Twin Hollow." A. J. Thornsberry was a magistrate, and Will Thornsberry was a constable. They got information of the conduct of this plant and were arranging to make a raid upon it. A. J. Thornsberry wrote this letter to Joe J. Jones, a deputy sheriff:

"Hollybush, Kentucky, November 22, 1928.

"Mr. J. H. Jones: Please bring a man or two with you to-night for I have the biggest still outfit I guess there is on Beaver creek located. It is no guesswork for I saw it myself. There will be two or three men over here that will go with you. Please meet at Garret Thornsberry's after dark. Don't let any one on Hollybush see you come. Not later than two hours after dark anyway. Meet us at Garret's. Don't fail to come. We are sure to get some brandy for we found a barrel of apple pomace with the other barrels.

"Your Friend, A. J. Thornsberry."

Jones and others met at Garret Thornsberry's at the appointed time and spent the night waiting for A. J. Thornsberry. He did not come, and on Friday, November 23rd, Jones and his party started in search of Thornsberry. They found where a still had been, and found a lot of barrels, boxes, fruit jars, feed sacks, sugar sacks, etc. It had snowed the day before, but the snow was melted off the site where the still had been, thus indicating it was warm from recent operation. 118 yards from the still site they found the dead body of Will Thornsberry, and 227 yards from the still site the dead body of A. J. Thornsberry. The other circumstances under which these men were slain will be disclosed in our discussion of alleged errors in admitting and rejecting evidence, which is one of the grounds urged for reversal.

The commonwealth introduced Benton Stamper, the surveyor of Knott county, and he testified he made a survey of the premises, and he was allowed to put in evidence a map made of that survey. This map gives the local geography, and in addition gives the distances of the homes of certain ones from the still site: From Joe Martin's, to still site, 2,250 feet. From Miles Bates, Sr., to still site, 1,450 feet. From Albert Cook's, to still site, 2,600 feet. From Seymour Slone's, to still site, 2,500 feet. It shows location of the dead body of Will Thornsberry and the dead body of A. J. Thornsberry, the still site, and paths and other things about it. It shows near location of the body of Will Thornsberry a 30-inch white oak tree, behind which Will was probably hiding; also a 16-inch black oak on which brain and blood were found, an 8-inch hickory from which a 25-20 bullet was extracted, a 12-inch red oak from which a .38 caliber bullet was extracted, and a 4-inch sourwood, a small dogwood, a 2-inch hickory and a 4-inch dogwood that had been glanced by bullets, and a series of arrows showing the direction of these bullets as indicated by the marks on the timber. It shows a large rock behind and not far from which the body of A. J. Thornsberry was found.

There is also marked on this map a spot with these words near it: "Signs of watchman's outpost found here. From this point a good view of the surrounding territory can be obtained."

He then testified in detail about his survey, this map, and things indicated upon it, as well as other matters observed by him, but not shown on the map. He testified about the spot marked "Signs of watchman's outpost," etc. He described a tree that had been cut when the leaves on it were green, so that they did not fall off, but dried thereon, and thus afforded concealment for this watchman, and the evidence given by the earth there showing it had been tramped or patted down. On cross-examination he admitted he made this survey in February, 1929, and knew nothing of where the bodies of these men were found, except what he was told; that he had not himself made the map, and knew nothing of how many people had been over and on the premises after the killing.

The defendant moved to strike the whole of his evidence, and now contends that the overruling of that motion was error.

So far as the making of the map by another man is concerned, that amounts to nothing, for Stamper testified he was present and assisted therein and the map is correct. The map only gave the jury in a geographical form the same things to which Stamper testified, and there was no evidence the surroundings had been changed in any way, and other witnesses testified they were there when these bodies were found; that the map correctly showed the conditions as they found them then, so there is no merit in defendant's contention.

We have not overlooked the statement of L. G. Thornsberry that he did not find the "signal place" when he was there on November 23, 1928, but that does not mean it was not there. He was interested in the discovery of his slain kinsmen, and may not have looked for it. He explained that, when he found these signs in February, 1929, they were old signs.

We are unable, by any words of ours, to give a description of these premises conveying any idea of them that even approaches the understanding of them this man gives. In Evans v. Com., 230 Ky. 411, 19 S. W. (2d) 1091, 1097, we said:

"No good reason could be given why a witness, when asked to state the shape of a piece of land, should not be permitted to take a pencil and draw an outline of the shape of it. He might find it very difficult to describe the shape of it, but could illustrate so that it could be clearly understood."

The introduction of a map previously made is in no wise different from one drawn by a witness in the presence of the jury.

He objected to the reading of the letter copied above, but there is no merit in that; all that letter shows is that Esq. Thornsberry had located a still and was arranging to make a raid on it. It certainly was not prejudicial to the defendant, and is a very different matter from the evidence of a witness before a coroner's jury, which in Newsom et al. v. Com., 171 Ky. 333, 188 S. W. 387, was held inadmissible. See, also, Eaton v. Com., 230 Ky. 250, 19 S. W. (2d) 218.

L. C. Young, the sheriff of Knott county, should not have been permitted, so defendant says, to testify to finding and destroying a still near the homes of Miles Bates, Sr., Seymour Slone, and Albert Cook; but the answer is, he did not object to it. The same is true relative

to Young's testimony about finding a still near Slone's residence, about a raid he made with Andrew Mullens, on which he found some whisky near home of Miles Bates. Young was permitted, over the objection of defendant, to say that shortly after finding the still on the point he discharged Albert Cook as a deputy. Ordinarily evidence that Cook had been discharged would not be admissible, but in view of the fact that Cook's defense is an alibi, that at the time of this murder he was in another part of the county endeavoring to find and arrest one Jay Bates, the court did not err in admitting it, though it properly should have come in rebuttal.

Mr. Young was allowed, over the objection of defendant, to testify that upon one raid which he and Clark Day made that Day took a .44 Smith and Wesson special pistol off of Albert Cook. We fail to see the materiality of that; Cook was then a deputy sheriff, and had a right to carry a pistol as such officer, but the admission of this was not prejudicial.

Young was further allowed, over the objection of Cook, to say that at the time he gave Cook the warrant for the arrest of Jay Bates, that his purpose was for Cook to get some one else to make the arrest. We see no objection to this, except it should have come in rebuttal, but the admission of it in chief was within the discretion of the court.

The court allowed the commonwealth to show by Farrel King that he had hauled meal, sugar, and apples to Joe Martin; that he had hauled apples for Albert Cook, and had left them at Joe Martin's; and that Joe Martin had given him some brandy. The defendant cannot complain of this, however, for he did not object to it, except when the witness said it was something like five months before the killing. The object of this evidence was to show these men were making liquor, and this occurrence was not so remote as to be inadmissible, and that is especially so, as the witness in a later part of his evidence fixes all these apple deliveries within five or six weeks of the killing.

Ferrel King was allowed to testify Joe Martin told him he had a drink for him, if he wanted it, and that Martin gave him a drink of brandy.

Riley Johnson was allowed to testify that Miles Bates, Sr., said to him, in September, 1928, that he had a good secret still place, and that if he had up anything,

and Andy and Will Thornsberry came up there pilfering around they would be to haul or pack out, and that he had a similar conversation with him a few days before when Mrs. Johnson was present.

G. W. Breeding testified he had a talk with Miles Bates, Sr., in September, 1928, about the activities of the revenue officers, and how severe the law was getting to be, and that he said, if those little fisty Andy and Will Thornsberry go to fooling around up there, they would get their heads blown off.

Elisha Johnson testified to a conversation with Joe Martin and Miles Bates, Sr., in presence of John Isaac shortly before the killing, in which Martin said he had 16 barrels up the left-hand hollow, and that Martin called to his wife to bring him some whisky, and she did so, and he took a drink, Isaac took a drink, and Miles took two. As he and Miles walked up the road, Miles showed him the place where the boys got their water.

John Isaac testified he was present at the conversation with Martin and Bates, and that Martin gave him a drink, and said he and the boys had sixteen barrels.

The court admonished the jury they could only consider these threats and statements against Albert Cook, if, after they had heard all the evidence, they concluded a conspiracy had been established; that then what was said by one of the defendants in the indictment would be chargeable to the others. With this admonition this evidence was properly admitted.

### OTHER CRIMES.

That this magistrate, Andy Thornsberry, was killed by some one interested in the operation of this still is beyond question. Ordinarily evidence of other crimes is irrelevant and inadmissible (section 1135, p. 586, 16 C. J.); but there are exceptions to this rule, and such evidence is admissible to show identity (section 1135, p. 588, 16 C. J.), guilty knowledge (section 1136, p. 589, 16 C. J.), intent (section 1139, p. 590, 16 C. J.), motive (section 1139, p. 590, 16 C. J.), plan or system (section 1140, p. 591, 16 C. J.), etc. This evidence tended to show these things, and this distinguishes it from the evidence of shooting a pistol in front of a car, condemned in the latter part of the opinion in Howard v. Com., 230 Ky. 738, 20 S. W. (2d) 748. This case is also distinguishable from Slone v. Com., 230 Ky. 199, 18 S. W. (2d) 1005,

for there the evidence of other crimes proven was not introduced to, and did not tend to, establish any of the things set out above.

Joseph Slone testified that about 9 p. m. Saturday, November 17, 1928, he was at the home of Miles Bates, Sr.; that Stewart Campbell was with him; that he saw Miles Bates, Sr., Miles Bates, Jr., Ray King, Albert Cook, and Seymour Slone there; that they were drinking; and that he bought some brandy from Ray King. Albert Cook became angry and drew his pistol on Slone, then pointed it at Stewart, and said he had a notion of killing Stewart, and that he was running that business over there; that Ray King also had a pistol. This same thing was shown by Seymour Slone.

The court said to the jury: "The question as to him (Albert Cook) having the liquor, selling the liquor, is competent in consideration of the question as to whether or not he was engaged in operating the still in question, if it sheds any light on that question. Any difficulty he had there I don't think is material." We feel that, in view of the court's admonition, the evidence was properly admissible, and this applies to the evidence of the next two witnesses.

Elisha Johnson testified he and John Isaac bought a moonshine still from Albert Cook shortly before this killing. John Isaac testified he was present when Johnson bought a still from Cook, but Isaac denied being interested in the purchase. This brings us to the defendant's next ground for reversal.

### THE INSTRUCTIONS.

Seymour Slone is named in this indictment as one of the conspirators who did this murder. He was introduced by the commonwealth and testified he and the others named in the indictment were engaged in the operation of this still, and that he had been taken in just a few days before; that they had previously been making apple brandy there, that he went there before daylight on Thursday, Nov. 22d, and started the fire; that soon Ray King came, then Miles Bates, Jr., and then Joe Martin; that after they had worked for awhile he (Slone) went to Joe Martin's to get some smoking tobacco, and when he returned Albert Cook told him they would have to pour out; that they had killed Will and Andy Thornsberry; that they parted, Martin and King

went down the creek, and the others went to Miles Bates, Sr.'s; that Albert Cook had a rifle, and Miles Bates, Jr., had Cook's pistol; that before leaving the still site Albert Cook said, if he thought a man would squeal, he would give him the same thing; that Miles Bates, Sr., knew about these distilling operations, and that they stayed at his place about an hour on that Thursday morning after the killing; that they then separated, and that the alibi was fixed up while they were in the jail at Hindman; and they were advised to "stick to the tale;" that he had entered into no agreement with the others to kill the Thornsberrys, and knew of no plans to kill them.

Cook insists Slone was an accomplice, and that the jury should have been instructed as required by section 241, etc., of the Criminal Code.

The answer to that is there was no evidence that Seymour Slone had anything to do with this homicide. A charge of being so in an indictment is not enough; there must be some evidence of his criminal participation in the crime. Sizemore v. Com., 6 S. W. 123, 10 Ky. Law Rep. 1. He must do something, must take some part, must perform some act, or owe some duty to the person in danger. Levering v. Com., 132 Ky. 676, 117 S. W. 253, 136 Am. St. Rep. 192, 19 Ann. Cas. 140. See Pierson v. Com., 229 Ky. 584, 17 S. W. (2d) 697; 16 C. J. p. 677, sec. 1367.

Defendant complains of the instruction on self-defense, but the answer to that is he was not entitled to an instruction on self-defense at all. See Clark v. Com., 227 Ky. 423, 13 S. W. (2d) 250.

Bast v. Com., 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967, cannot be distinguished from this one; it was an assassination, the evidence circumstantial, no eye-witnesses, and the defense was an alibi. There was no instruction given on either manslaughter or self-defense, yet the judgment was affirmed. One is not entitled to an instruction on self-defense unless the evidence justifies it. We have affirmed death sentences where no self-defense instructions were given. Ferrell v. Com., 176 Ky. 330, 195 S. W. 495; Lawson v. Com., 152 Ky. 113, 153 S. W. 56; Slagel v. Com., 81 Ky. 485; Dockery v. Com., 218 Ky. 703, 292 S. W. 336; Fowler v. Com., 13 Ky. Op. 853.

It is no trouble to find cases where the defense was an alibi, and no self defense instructions were given.

See, Bowlin v. Com., 195 Ky. 600, 242 S. W. 604; Lankford v. Com., 211 Ky. 219, 277 S. W. 239; Kirk v. Com., 192 Ky. 460, 233 S. W. 1060; Grau v. Com., 185 Ky. 111, 214 S. W. 916; Bast v. Com., 124 Ky. 747, 99 S. W. 978.

His next contention is that he established his alibi so completely (by fourteen witnesses) that his conviction is flagrantly against the evidence. One answer to this is the jury did not believe his witnesses. We cannot reverse a judgment because the jury believed one set of witnesses rather than another. Gilbert v. Com., 228 Ky. 19, 14 S. W. (2d) 194.

Moreover, just at the time of this shooting, his alibi gets very thin. He has no one then, except himself and a few of his codefendants, who say they were in a sink hole on the mountain side playing cards. When we consider the evidence of the other witnesses that a snowstorm was then prevailing, his alibi gets still thinner.

The judgment is affirmed.