Mark Alan GOSSER, Appellant/Cross–Appellee,

v.

COMMONWEALTH of Kentucky, Appellee/Cross–Appellant.

Nos. 1997–SC–0946–MR, 1997–SC–0947–MR.

Supreme Court of Kentucky.

Nov. 22, 2000.

Mark J. Stanziano, Kathryn G. Wood, Law Office of Mark J. Stanziano, Somerset, for appellant/cross-appellee.

A.B. Chandler III, Attorney General of Kentucky, Perry T. Ryan, Gregory A. Ousley, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, for appellee/cross-appellant.

JOHNSTONE, Justice.

Appellant, Mark Alan Gosser, was convicted of wanton murder in the Pulaski Circuit Court, and was sentenced to twenty years' imprisonment. He appeals to this Court as a matter of right. We affirm.

Gosser's conviction stems from the events of February 9–10, 1996, when a party was held at a home in Somerset, Kentucky. Witnesses testified that Gosser went to the party to find Danny Abbott, with whom Gosser had a dispute a few days before. Abbott blamed Gosser for slashing his tires, and Gosser thought Abbott had set him up to be arrested.

At some point after Gosser arrived at the party, he saw Abbott and the two stepped outside to settle their dispute. They began to argue, and a crowd gathered in anticipation of a fight. Shortly thereafter, Christopher Ryan Parmalee, a friend of Gosser, came outside, and he and Abbott began to fight. Gosser briefly entered the fight, then stepped back, pulled

out a gun, and fired it. Although several witnesses testified that Gosser fired the gun while it was pointed at Abbott, Gosser maintained that the positioning of the participants in the fight made it impossible for the gun to be pointed at Abbott, and that he fired the gun only to break up the fight between Abbott and Parmalee.

In any event, the shot fired by Gosser hit Britt Bell in the center of his chest, and Bell died approximately seven hours after arriving at the hospital. Gosser was tried and convicted of wanton murder, and was sentenced to twenty years' imprisonment. This appeal followed.

On appeal, Gosser presents three issues: (1) whether the trial court erred in admitting into evidence photographs and computer-generated models of the crime scene that were prepared by the police; (2) whether the trial court erred in denying Gosser a continuance; and (3) whether the trial court erred in failing to grant a mistrial because the Commonwealth made a key witness unavailable to testify. For the reasons set forth below, we affirm Gosser's conviction.

On cross-appeal, the Commonwealth presents one issue: whether the trial court erred in excluding statements made by Britt Bell after he was shot, because those statements constituted a dying declaration. The Commonwealth has requested review of this issue only if Gosser's conviction is reversed and remanded for a new trial. Because we affirm Gosser's conviction, we will not consider the issue presented on cross-appeal.

## I. ADMISSION OF POLICE–CREATED PHOTOGRAPHS AND COMPUTER DIAGRAMS

Gosser argues that the trial court erred by admitting Commonwealth's Exhibits 7, 8, 9 and 10. Exhibits 7 and 8 are photographs of the crime scene in which the police had planted colored flags and had made spray-painted marks to show the locations of individuals and evidence at the time of the shooting. Exhibit 9 is a two-dimensional computer-generated diagram of the crime scene. Exhibit 10 is a three-dimensional computer-generated diagram of the crime scene.

### Exhibits 7 and 8, the Photographs

These exhibits were admitted through the Commonwealth's first witness, Detective Rice. When the Commonwealth sought to admit Exhibits 7 and 8, Gosser objected on two separate grounds: (1) that the photos did not fairly and accurately depict the area photographed on the night of the shooting; and (2) that the photographs were "composite" diagrams for which the Commonwealth had not laid the proper foundation for their admission. The trial court overruled the objections and admitted the photographs subject to Gosser's right to cross-examine Detective Rice and other witnesses on how the information was obtained. On direct examination, Detective Rice identified who or what each colored flag and spray-painted mark in Exhibit 7 represented and explained how the reconstruction of the crime scene represented in the photograph was prepared in the following manner:

Prosecutor: OK. Now what did you rely upon in determining the positions of the various witnesses to the shooting?

Rice: The witness['s] statements. . . .

Prosecutor: OK. Did you take any witness with you when you did the reconstruction of the actual shooting itself?

Rice: Yes. We had one witness come out . . . Jimmy Dan Carroll.

Prosecutor: And with his assistance[,] and relying upon the [other] witnesses' statements that had been taken by the police department[,] were you able to reconstruct where the witnesses were standing at the time of the shooting?

Rice: Yes.

Prosecutor: OK. And how did you do that—do that reconstruction?

Rice: We just had a working knowledge ourselves through our witnesses as to where they were positioned and we had Jimmy Dan Carroll pointing out to us where different witnesses were standing, where those involved, the three individuals were at, and we placed orange flags, repositioning of these individuals.

Prosecutor: OK. Now, after you placed the orange flags[,] did you take some photographs of that?

Rice: Yes. Lieutenant Gary Jones took photographs.

Prosecutor: OK. But you were out there.

Rice: Yes, sir. I was videoing.

Detective Rice then testified that the photograph fairly and accurately depicted the reconstruction as it appeared when photographed. Detective Rice's testimony concerning Commonwealth's Exhibit 8, the aerial photograph, was similar.

■ It was improper for the Commonwealth to introduce Exhibits 7 and 8 through Detective Rice. While the exhibits are physical photographs, they were used by the Commonwealth as diagrams of the crime scene to show the locations of various witnesses, the defendant, the victim, and the murder weapon. Detective Rice, who was not present at the crime at the time of the shooting, did not have personal knowledge of the location of the persons and the items represented in the photographs at the time of the shooting. His testimony to that effect was based on hearsay.

Nor was Detective Rice's testimony necessary to show how the crime scene reconstruction was prepared. The introduction of a map or diagram made prior to trial is in "no wise different from one drawn by a witness in the presence of the jury." *Cook v. Commonwealth*, Ky., 232 Ky., 613, 24 S.W.2d 269, 271 (1930). In *State v. Furlough*, 797 S.W.2d 631 (Tenn.Crim.App. 1990), the defendant objected on hearsay grounds to the introduction of a diagram of the crime scene. *Id.* at 646. The diagram had been prepared by the investigating officer, who did not testify. *Id.* The *Furlough* court determined that the diagram, while based on hearsay, should not be excluded as such, stating:

> As long as the witness has personal knowledge of the subject matter and the diagram is accurate, drawings drafted out of court are admissible despite the hearsay rule. The in-court authentication of the drawing is the assertion permitting cross-examination of its accuracy. That is sufficient to satisfy the hearsay objection.

*Id.* at 647 (internal citations omitted). The fact that the diagram in this case was created in a photograph, rather in a drawing, is of no consequence.

■ In the case at bar, the Commonwealth should have authenticated the crime scene reconstruction photographs/diagrams through the individual witnesses who were present at the time of the shooting. These witnesses had personal knowledge of the subject matter of both the physical crime scene and the accuracy of the placement of the identifying orange flags. Once the photographs/diagrams had been properly authenticated, whether to formally admit them as an exhibit would have been left to the sound discretion of the trial judge. *See Wilson v. Commonwealth*, Ky., 551 S.W.2d 569, 571 (1977).

### *Exhibits 9 and 10, the Computer Diagrams*

The use of computer-generated graphics and animation as evidence is a growing trend in the Commonwealth, as it is in courtrooms all across the land. Heretofore, this Court has not addressed any of the many issues concerning the admission of this type of evidence. However, there is a growing body of case law and law review articles concerning these issues.

■ Computer generated visual evidence (CGVE) is usually divided into two broad categories: (1) demonstrative; and

(2) substantive.[1] Demonstrative CGVE usually consists of still images or animation which merely illustrates a witness's testimony.[2] Substantive CGVE usually consists of computer simulations or recreations, which are prepared by experts and which are based on mathematical models in order to recreate or reconstruct an incident or event.[3] In turn, the standard of admissibility depends on how the CGVE is categorized.[4] This situation is much like our approach to the introduction of photographs. As explained in *Litton v. Commonwealth*, Ky., 597 S.W.2d 616 (1980):

> Photographs are most commonly admitted into evidence as demonstrative evidence on the theory either that they are merely a graphic portrayal of oral testimony or that a qualified witness adopts the photograph as a substitute for words. See McCormick on Evidence, Sec. 214 (1972); 3 Wigmore on Evidence, Sec. 790 (Chadbourn rev. 1970). When a photograph is used as demonstrative evidence, the witness need not be the photographer, nor must he have any personal knowledge of the time, method, or mechanics of the taking of the photographs. The witness is only required to state whether the photograph fairly and accurately depicts the scene about which he is testifying....
>
> Photographs can be admitted as real evidence in a proper case. As stated in Wigmore:

> "With later advancements in the art of photography, however, and with increasing awareness of the manifold evidentiary uses of the products of the art, it has become clear that an additional theory of admissibility of photographs is entitled to recognition. Thus, even though no human is capable of swearing that he personally perceived what a photograph purports to portray (so that it is not possible to satisfy the requirements of the 'pictorial testimony' rationale) there may nevertheless be good warrant for receiving the photograph in evidence. Given an adequate foundation assuring the accuracy of the process producing it, the photograph should then be received as a so-called silent witness or as a witness which 'speaks for itself.' "

*Id.* at 618–19.

 *Litton* was decided before the adoption of the Kentucky Rules of Evidence. While its approach to admissibility is entirely consistent with the KRE, it is not necessary to classify the photographs as "demonstrative" or "real" in order to determine their admissibility under the KRE.[5] Likewise, while classifying a particular type or piece of CGVE as either "demonstrative" or "real" might be helpful as a starting point, the question of admissibil-

---

**1.** Dean M. Harts, *Reel to Real: Should You Believe What You See,* 66 Def.Couns.J. 514, October 1999.

**2.** Timothy W. Cerniglia, *Computer–Generated Exhibits–Demonstrative, Substantive or Pedagogical–Their Place in Evidence,* 18 Am.J. Trial Advoc. 1, Summer 1994 at 4–5.

**3.** *Id.* at 5.

**4.** *Compare Cleveland v. Bryant*, 236 Ga.App. 459, 512 S.E.2d 360, 362 (1999) (computer-generated animation, which merely illustrates the witness's testimony, is admissible if it is a fair and accurate representation of the scene sought to be depicted) *with Livingston v. Isuzu Motors, Ltd.*, 910 F.Supp. 1473, 1494–95 (D.Mont.1995) (The trial court properly admitted a computer-generated accident simulation introduced through one of the plaintiff's experts. The simulation recreated the underlying accident and was produced using a vehicle simulation computer program developed by the expert. Based on the lengthy testimony by the expert concerning the development, testing, error rate, acceptance of the program by others in the field and the peer review of the computer simulation methodology, the trial court found that the simulation was admissible under FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

**5.** *See generally,* Robert G. Lawson, *The Kentucky Evidence Law Handbook,* § 11.05, pp. 597–610 (3d ed.1993).

ity is ultimately determined under the KRE.[6]

The admissibility of computer-generated diagrams, like those at issue in the case at bar, are analyzed the same as diagrams drawn by hand or photographically created (see discussion *infra*). That is, computer-generated diagrams have to be relevant, KRE 402; are subject to exclusion under KRE 403; are subject to the trial court's discretion over the mode and order of the presentation of evidence, KRE 611; and have to be authenticated by testimony of a witness that he or she has personal knowledge of the diagram's subject matter and the diagram is accurate, KRE 901. Further, because a computer-generated diagram, like any diagram, is merely illustrative of a witness's testimony, its admission normally does not depend on testimony as to how the diagram was prepared, *e.g.,* how the data was gathered or inputted into the computer. *Cf. Cook v. Commonwealth, supra; State v. Furlough, supra.* Of course, where a diagram purports to contain exact measurements, to be drawn to scale, etc., then testimony as to how the data was obtained and inputted into the computer would be relevant and could be necessary to the admission of the diagram.

The computer diagrams, Commonwealth's Exhibits 9 and 10, were likewise introduced through Detective Rice, who again testified that the location of persons and items depicted in the diagrams were supplied to him by witnesses. While he also testified as to physical landmarks (trees, air conditioning units, etc.) and distances in the diagram which he personally observed and measured, Detective Rice lacked personal knowledge of the most relevant parts of the subject matter of the diagram. His testimony, as it was illustrated in the diagrams, concerning where persons were located at the time of the shooting was based on hearsay and should not have been admitted.

While it was error to allow the Commonwealth to admit the above exhibits through Detective Rice, the error was harmless. RCr 9.24.

The Commonwealth called a variety of witnesses who were present at the time of the shooting and who referred to the diagrams in question. The testimony from these witnesses was sufficient to authenticate the diagram. Thus, the error as to the introduction of the diagram through Detective Rice was cured by the testimony of subsequent witnesses. There remains the potential prejudice created by Detective Rice's testimony, which effectively served to bolster the testimony of the witnesses to the shooting. *See Bussey v. Commonwealth,* Ky., 797 S.W.2d 483, 485 (1990).

Under the harmless error doctrine, if upon consideration of the whole case it does not appear that there is a substantial possibility that the result would have been any different, the error will be held non-prejudicial. *Abernathy v. Commonwealth,* Ky., 439 S.W.2d 949, 952 (1969). We do not believe that the result in this case would have been any different had the diagrams been properly introduced through the witnesses who were present at the scene of the shooting rather than through Detective Rice for the following reasons.

---

6. *Cf.* Norman C. Ankers & Ronald S. Longhofer, *Computer–Based Evidence Under the Michigan Evidence Rules,* 78 Mich.B.J. 678, July 1999 at 685, in which the authors conclude that the Michigan Rules of Evidence "work nicely in conjunction with computer data....". ; Gregory P. Joseph, *A Simplified Approach to Computer–Generated Evidence and Animations,* 156 F.R.D. 327 (October, 1994), in which the author applies the Federal Rules of Evidence to a variety of issues arising from the introduction of computer-generated evidence; *But cf.* Alexandra Tzoumas, *Maryland Sets New Standard for Computer–Generated Evidence Admissibility,* 12 No. 4 Inside Litig. 18 (April, 1998), in which the author outlines changes made to Maryland Rules of Practice and Procedure for the admission of certain types of computer-generated imagery.

The jury was instructed on both intentional murder and wanton murder. The intentional murder instruction allowed the jury to find Gosser guilty of the intentional murder of Britt Bell if he pulled the trigger of his handgun with the intention of killing Danny Abbott. This is a classic example of the principle of transferred intent.[7]

The Commonwealth's theory of the case was that Gosser and Ryan Parmalee went to the party where the shooting occurred to pick a fight with Danny Abbott. According to the Commonwealth's witnesses, Parmalee and Abbott began fighting and Gosser came to Parmalee's assistance by striking Abbott in the head with a football style block. According to Abbott's testimony, he responded by stating, "Oh, it's two on one." Immediately thereafter, Gosser stepped back, pulled a handgun from his pocket, pointed it at Abbott's head and fired.

The defense's theory of the case was that Gosser was not involved in the fight between Abbott and Parmalee and that Gosser neither aimed nor shot at Abbott. Rather, Gosser blindly shot away from both Abbott and Parmalee in an attempt to break up the fight between the two. Parmalee's statements, which were introduced into evidence, and the testimony of another witness supported the argument that Gosser fired away from both Parmalee and Abbott.

The diagrams support the Commonwealth's theory in that they tend to show Britt Bell and Gosser at opposite endpoints of an imaginary straight line, with Abbott located at a point on the line between the two. The jury, however, did not convict Gosser of intentional murder. Rather, he was convicted of wanton murder. Thus, the jury did not accept the Commonwealth's theory of the case on this point. However, by all accounts, the night was dark and a number of people were outside watching the fight between Abbott and Parmalee and, possibly, Gosser. The

presence of others was known to all involved in the altercation. To randomly fire a gun in the dark in a direction where one knows or should know there exists a high probability of the presence of people, clearly supports the jury's finding that Gosser acted wantonly under circumstances manifesting extreme indifference to human life. There is not a substantial possibility that, under the facts of this case, the exclusion of the improper bolstering testimony of Detective Rice would have produced a different result. The error was harmless.

## II. CONTINUANCE

Next, Gosser argues that the trial judge abused his discretion when he denied Gosser's motion for a continuance because the Commonwealth withheld statements made by Parmalee to the police and the grand jury until shortly before trial. Four days before trial, Gosser made a motion for a sixty-day continuance because approximately five days before he had received notice that the Commonwealth had reached an agreement with Parmalee. Gosser's attorney argued that this information required changes in strategy, and that he could not adequately prepare for the cross-examination of Parmalee without the continuance.

Further, Gosser urges that he should have received a continuance because, on the date trial was to begin, the Commonwealth provided six diagrams which were created during police interviews with eyewitnesses. The diagrams were kept by one of the investigating officers, and the Commonwealth asserted that it produced all the information it had at the time of Gosser's request.

As Parmalee's statements and the witness diagrams were provided within different time frames, they will be discussed separately below.

A. *Diagrams from Witness Statements*

---

7. *See* David J. Leibson, 13 Kentucky Practice: *Tort Law* § 1.3, pp. 5–7 (1995).

■ The witness diagrams were not provided until the first day of trial. Their late production violated RCr 7.26, which is commonly referred to as the "forty-eight hour rule." RCr 7.26 provides, in pertinent part:

> Except for good cause shown, not later than forty-eight ... hours prior to trial, the attorney for the Commonwealth shall produce all statements of any witness in the form of a document or recording in its possession which relates to the subject matter of the witness's testimony and which (a) has been signed or initialed by the witness or (b) is or purports to be a substantially verbatim statement made by the witness. Such statement shall be made available for examination and use by the defendant.

The diagrams at issue fell within the scope of RCr 7.26. They were witness statements in documentary form that were in the possession of the Commonwealth.[8] Further, they were related to the subject matter of the witnesses's testimony and were signed by the witnesses.

■ However, even if the forty-eight hour rule is violated, automatic reversal is not required. *McRay v. Commonwealth*, Ky.App., 675 S.W.2d 397, 400 (1984). Some prejudice must be found, or the error, if any, is harmless. *Id.* Gosser argues that the violation of the forty-eight rule, without demonstrating any prejudice from that violation, is sufficient for reversal. We disagree. Because Gosser has not shown that he was prejudiced by that violation, we will not disturb the trial judge's decision.

B. *Parmalee's Statements*

■ Parmalee's statements were provided five or six days before trial. The production of Parmalee's statements to the police clearly did not violate the forty-eight

hour rule. However, waiting four days before trial to provide his statement to the grand jury investigating the shooting of Britt Bell violated the spirit, if not the letter, of RCr 5.16(3), which provides in pertinent part, "any person indicted by the grand jury *shall have a right* to procure a transcript of any stenographic report or a duplicate of any mechanical recording relating to his or her indictment...." (emphasis added).

Gosser first requested a copy or a tape of the grand jury testimony on March 1, 1996. The transcript of Parmalee's testimony to the grand jury was not provided to the defense until September 2, 1997. While it is not clear from the record when a copy of the rest of the grand jury testimony was provided to Gosser, it apparently was provided much earlier in time. The Commonwealth has offered absolutely no justification or reason that it delayed providing the defense with Parmalee's testimony to the grand jury. While the failure to do so is indefensible, it is not reversible error under the facts of this case.

■ Whether a continuance is appropriate in a particular case depends upon the unique facts and circumstances presented. *Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579 (1991). A ruling on a motion for a continuance will not be overturned without a showing of abuse of discretion. *Bagby v. Commonwealth*, Ky., 424 S.W.2d 119 (1968).

■ In denying Gosser's motion for a continuance, the trial court stated that, while it found defense counsel's argument to be compelling, it also found that trying the case as scheduled would not substantially prejudice the defense. Gosser argues that notice of the Commonwealth's deal with Parmalee and the tardily provided written statements necessitated defense counsel reformulating the case. While

8. A statement taken by an investigating officer or other agent of the Commonwealth is deemed to be in the possession of the Commonwealth, regardless of whether the Commonwealth's attorney is personally aware of the existence of the statement. *Anderson v. Commonwealth*, Ky., 864 S.W.2d 909, 912 (1993).

possibly true, we cannot say that the trial court abused its discretion in denying Gosser's motion for a continuance, especially in light of the fact that this case previously had been continued twice because of scheduling conflicts.

### III. MISTRIAL

Parmalee made four statements to police after Bell's death, and he also testified before the grand jury that indicted Gosser. Subsequently, Parmalee was charged and indicted in a separate case for conspiracy to commit murder. Shortly before trial, the Commonwealth reached an agreement with Parmalee whereby he would provide truthful testimony of the circumstances surrounding the shooting in exchange for the dismissal of the indictment.

The Commonwealth closed its case in chief without calling Parmalee as a witness. Thereafter, the court held a conference in chambers to hear motions by counsel. Defense counsel inquired as to Parmalee's whereabouts and indicated the defense's intention to call Parmalee as a witness. After the Commonwealth Attorney stated that he was not going to dismiss the indictment against Parmalee, Parmalee's attorney advised the trial court and counsel that he would advise Parmalee to assert his Fifth Amendment privilege if he was called to the stand by the defense. Defense counsel then moved for a mistrial.

The trial court initially indicated that it would grant a mistrial because Gosser was unable to call Parmalee as a witness. However, defense counsel raised the possibility of declaring Parmalee an unavailable witness pursuant to KRE 804(a)(1), and admitting his statements to the grand jury as an exception to the hearsay rule pursuant to KRE 804(b)(1). Nonetheless, defense counsel moved the trial court to rule on his motion for a mistrial, which motion the trial court denied. Subsequently, Parmalee's grand jury testimony was read to the jury in its entirety. Without objection from the Commonwealth, the trial court

also allowed Parmalee's statements to the police to be read to the jury.

A defendant's motion for a mistrial should only be granted where there is a "manifest necessity for such an action or an urgent or real necessity." *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672, 678 (1985), *cert denied*, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). The trial court has broad discretion in determining when a mistrial is necessary. As explained in *Wiley v. Commonwealth*, Ky.App., 575 S.W.2d 166 (1979), "Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared...." *Id.* at 169, quoting *Gori v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961).

In his brief, Gosser states, "... when one looks at the totality of Parmalee's statements ... one is confronted with the realization that Parmalee's version of events support [Gosser's] version of events and not the prosecution's ... theory.... Parmalee's statements ... are replete with exculpatory statements." Indeed, Parmalee's statements support the defense's theory that Gosser did not aim and intentionally fire at Abbott, but rather, that he fired the gun in a direction away from Abbott. Thus, Parmalee's hearsay statements benefited the defense.

Gosser argues that live testimony is preferable to statements read into the record. However, this Court deals with reversible error, not preferences. Parmalee's hearsay statements were read to the jury. The statements supported Gosser's theory of the case. Finally, Gosser has not argued that Parmalee's live testimony would have been substantially different or more beneficial to the defense. There was no manifest necessity requiring a mistrial; the trial court did not abuse its discretion in denying Gosser's motion.

For the foregoing reasons, Gosser's conviction is affirmed.

LAMBERT, C.J.; COOPER, GRAVES, KELLER, and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion.

STUMBO, Justice, dissenting.

Respectfully, I must dissent. The majority opinion finds that the trial court erred in admitting a number of exhibits because they were not properly authenticated, that there was a violation of RCr 7.26 and of RCr 5.16(3) and that while a mistrial could have been declared, same was waived by the defense. In summary, the majority opinion holds that the trial was rife with error, none of it reversible. Perhaps that is so, but in my view, when the errors are considered together, it is clear that Appellant was denied a fundamentally fair trial. The jury saw exhibits that may not truly have been representative of the crime scene, heard testimony from witnesses that could not be cross-examined and the defendant had a defense counsel who was faced with a change in defense strategy only days before trial. We seldom reverse cases on the basis of cumulative error but this is one in which we should. I would grant Appellant a new trial.