# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2024-SC-0021-MR

D'CORYA WHITE             APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE MITCHELL PERRY, JUDGE
NO. 22-CR-002427

COMMONWEALTH OF KENTUCKY          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

D'Corya White was convicted of first-degree robbery, kidnapping, and possession of a handgun by a convicted felon and was sentenced to twenty-seven- and one-half years' imprisonment. He now appeals his convictions and sentence as a matter of right. Ky. Const. §§ 110, 115. After review we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

On October 25, 2022, at 4:04 p.m. Keisha Deonarine parked her black 2020 Ford Escape in the parking lot of Simmons College of Kentucky in Louisville. Keisha's class did not start until 4:15 p.m., so she remained in her car and checked emails on her cellphone. Approximately two minutes later, Keisha opened the driver's side door of her vehicle to get out and a man she did not know came up to the driver's side of the vehicle and pointed a handgun in

her face.  The man pushed the gun into Keisha's ribs and told her to "get over." He then pushed her over the vehicle's middle console and into the front passenger seat.  Keisha begged the man to let her go, attempted to appeal to his humanity by telling him that she had children and a fiancé, and told him he could have her purse if he let her go.  He simply responded, "no."  Keisha feared that the man was going to rape or kill her.

The man put the car in reverse and backed out of the parking spot.  He then struggled to put the rotary gearshift knob into drive.  Keisha recognized this as an opportunity to escape so she pushed as hard as she could against the gun and then jumped out of the passenger side door.  The man drove off with her vehicle while Keisha ran into one of the college's nearby buildings screaming "He's got a gun!"  One of the college's security guards and two staff members heard her screaming and came to her aid; they called 911 at 4:10 p.m.

Keisha did not get a good look at the man and the description she provided officers was that he was a black male with facial hair wearing a black hooded jacket made of windbreaker like material.  He had the hood of the jacket pulled up and his hair protruded from under it.  She likewise did not get a good look at the gun the man used.  She was certain that it had a black handle and believed that it had silver somewhere on it, but she could not remember where.

LMPD[1] Officer Christen Branan[2] was the first officer to respond to the college at 4:11 p.m. Keisha was hysterical and it took Ofc. Branan several minutes to calm her down. Once she did, Ofc. Branan learned that Keisha had an application on her cellphone called FordPass that enabled her to track her car's location and that she also had an Apple AirTag on her car keys that enabled her to track their location. The FordPass application indicated that the vehicle was parked behind 2303 Magazine Street in Louisville and the AirTag application indicated that the keys were at 2305 Magazine Street. Ofc. Branan relayed this information to other on duty officers at 4:21 p.m.

LMPD Detective James Conley arrived at Simmons College at 4:18 p.m. As Keisha's description of the suspect was limited, Det. Conley directed another detective to obtain the college's surveillance footage of the incident. From that footage, Det. Conley learned that the perpetrator was a black male of average build wearing a black, hooded, long-sleeved jacket with a small white logo on the left cuff; a white t-shirt with a large, colorful, square logo on the front; light wash, lightly distressed blue jeans; and white tennis shoes. A still photograph from the surveillance footage was disseminated to the officers responding to Magazine Street.

---

[1] Louisville Metro Police Department.

[2] Ofc. Branan was a detective at the time of her testimony but was a patrol officer at the time of this incident and investigation.

3

At 4:27 p.m., LMPD Officer Derrick Greene arrived at 2303 Magazine Street, which is roughly ten minutes away from Simmons College. The residence at 2303 Magazine Street has homes on either side of it that are mere feet away. 2305 Magazine Street, where the AirTag indicated Keisha's keys were, is to the immediate left of 2303 Magazine Street. To its immediate right is another residence, 2301, and to the immediate right of 2301 is a publicly accessible alleyway. That alleyway connects to another alleyway that runs behind the homes on Magazine Street. When Ofc. Greene arrived he did not see Keisha's vehicle in front of the residence, so he drove his cruiser through the alleyway to the back of the residence. There, he saw a black 2020 Ford Escape parked directly behind 2303 Magazine Street; the vehicle was backed in such that the back license plate could not be seen from the alleyway. The vehicle was later confirmed to be Keisha's via the VIN number and license plate. Ofc. Greene also observed a black male with black dread locks in the backyard wearing a white shirt and a black jacket. When the man noticed Ofc. Greene, he went into the residence. Ofc. Greene stayed with the vehicle while other officers cleared the residence.

At 4:29 p.m., LMPD Sergeant Derek Hurley arrived at the residence along with several other officers and ordered the occupants out over a bullhorn. White, his adult-aged brother and sister, and his mother, Rochelle Wyatt, exited the home without incident. White was a black male of average build with black, shoulder length dread locks and facial hair. Ofc. Greene later recognized White as the man he had seen when he first arrived at the

4

residence, although White was now wearing a royal blue long-sleeved shirt; light wash, lightly distressed blue jeans; and white tennis shoes.

Sgt. Hurley's body camera footage depicted him detaining White as soon as he exited the residence; White told Sgt. Hurley that he "just woke up." Sgt. Hurley instructed White to sit on the stoop of the adjacent residence while the officers ensured no one else was in the home. After the home was cleared, and detectives were inside the home speaking to Rochelle, White called Hurley over three different times to speak with him. The first time, White asked him what was going on and the sergeant told him they were investigating a vehicle at the residence that was not supposed to be there. White responded that people parked cars back there all the time, that it was a "dangerous neighborhood," and that people did "dangerous stuff" there all day. The second and third times White asked Sgt. Hurley what was going on and how long the officers were going to be there.

Meanwhile, inside the residence, detectives obtained Rochelle's consent to search. White was not living in the home and did not have a room of his own. In Rochelle's bedroom the officers found a black Champion hooded jacket made of a windbreaker-like material lying on Rochelle's bed. The jacket had a small, white, blue, and red Champion logo on the left cuff. They also found a black .380 handgun between the mattress and box spring in Rochelle's room; areas around the barrel of the gun were worn down such that they were silver rather than black. In the living room the officers found a white Nike t-shirt with a large, colorful, square emblem on the front lying on the couch. In

5

addition, Rochelle stated that she had arrived home roughly ten minutes before the officers got there and White had arrived around the same time. At that time, he had on a black jacket and blue jeans. She did not know why the black Ford Escape was behind her house, did not claim ownership of the gun, and did not know the gun was underneath her mattress.

Keisha's car was dusted for fingerprints and swabbed for DNA. No useable fingerprints were recovered, but the DNA results were as follows. The DNA profile found on the steering wheel was a mixture of at least three people with at least one male contributor, and White could not be ruled out as a possible contributor to the profile.[3] The profile found on the gearshift was a mix of at least three persons with at least one male contributor, and White could not be ruled out as possible a contributor.[4] The profile on the driver's seat control was a mix of at least two individuals with at least one male contributor, and White could not be ruled out as a possible contributor.[5] The gun found in Rochelle's bedroom was also swabbed for DNA. White was ruled out as a contributor to the profiles on the gun's grip and trigger, but the results obtained from swabs of the gun's slide, sights, buttons, and magazine were inconclusive.

---

[3] According to the DNA expert's report, the profile obtained from the sample was approximately 84,000 times more probable if the sample originated from White and three unknown persons than if it originated from four unknown persons.

[4] The profile obtained was approximately 45,000 times more probable if the sample originated from White and two unknown persons than if it originated from three unknown persons.

[5] The profile obtained was approximately 5,700 times more probable if it originated from White and one unknown person than two unknown persons.

At trial, White conceded that the offenses in question had occurred but asserted that he was not the perpetrator. He argued that law enforcement's investigation was rushed and incomplete and highlighted that, even at trial, Keisha was never able to positively identify White or the gun. White further argued that no witness ever saw him either driving the vehicle or getting in or out of it, that the items of clothing the officers found in Rochelle's house were mass-produced and common, that his fingerprints were not in the car, that his DNA was not on the gun, and that there was no cell phone data demonstrating he had been at Simmons College at the time of the carjacking.

The jury found White guilty of first-degree robbery, kidnapping, and possession of a handgun by a convicted felon. He now appeals his convictions and resulting sentence of twenty-seven- and one-half years to this Court.

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. The circuit court did not err by admitting still photographs from the surveillance footage.

White's first argument on appeal is that the circuit court erred by allowing the admission of what he characterizes as enhanced images captured from the Simmons College surveillance footage.

At trial, the Commonwealth introduced two surveillance videos that depicted the carjacking and the moments leading up to it from two different angles. In one of those videos, White walked directly across the camera's line of view, allowing a relatively clear view of his clothing and race, but not his face. Both videos were admitted into evidence and published to the jury during

Keisha's testimony, as the Commonwealth's first witness. Prior to the introduction of the videos, Keisha testified that she had reviewed both videos and that they were a true and accurate depiction of what occurred. The defense explicitly stated it had no objection to the videos being introduced.

Det. Conley, the lead detective, was the Commonwealth's final witness. He testified that he and two other detectives, Lunte and Hammock, responded to Simmons College after the 911 call came in. Upon arrival, Det. Conley was informed by campus staff that the college had a video surveillance system, but it was held offsite on Fourth Street. Det. Conley directed Det. Hammock to leave and collect the footage within minutes of their arrival. The Commonwealth played the surveillance footage a second time during Det. Conley's testimony, and he identified them as the videos that were collected by Det. Hammock. Det. Conley confirmed that prior to his testimony he reviewed some still photographs captured from the video surveillance footage that were "close ups" from that footage. He stated that the significance of those photographs was that they depicted the characteristics of the suspect's clothing and that Det. Hammock had distributed one of the still photographs to the other officers who used it to help identify the suspect when they responded to 2303 Magazine Street.

Before the Commonwealth moved to admit the photographs into evidence, the defense preemptively objected and argued that the photographs "are zoomed in enhancements and there's not been any foundation from an expert witness that this is reliable or how this would distort the images." The

8

defense argued that the images' probative value was therefore diminished and that they were unduly prejudicial. The Commonwealth responded that the photographs were still shots from a video that was already in evidence, that "the video application itself zooms the video all the way in," that the photographs were used by Det. Conley during his investigation, and that they are a fair and accurate representation of what is in the video. The circuit court agreed and overruled the objection. The Commonwealth then entered five still photographs into evidence depicting White as he approached Keisha's vehicle.

White relies on this Court's opinion in *Gosser v. Commonwealth*, 31 S.W.3d 897 (Ky. 2000); the federal circuit court opinions of *U.S. v. Roberts*, 84 F.4th 659 (6th Cir. 2023) and *U.S. v. Seifert*, 445 F.3d 1043 (8th Cir. 2006); and the sister state opinions of *Dolan v. State*, 743 So. 2d 544 (Fla. Dist. Ct. App. 1999), *Nooner v. State*, 907 S.W.2d 677 (Ark. 1995), and *English v. State*, 422 S.E.2d 924 (Ga. App. 1992), to argue that the trial court erred by admitting "enhanced images" taken from the surveillance video without testimony from a witness who could authenticate the images as a reliable and trustworthy representation of the perpetrator. White contends that these precedents required the individual who performed the "enhancements" to testify regarding the specific details of the process of obtaining the photographs and asks this Court to adopt the two-part test laid out by the *Roberts* Court which held that "digitally enhanced still images [and]. . . enhanced video and recordings are admissible if (1) the enhancements were properly authenticated

9

and (2) the analyst documented his steps when altering the source file." 84 F.4th at 670.

As a threshold matter, we disagree with White's assertion that the photographs at issue were "enhanced" or that the source video was "altered" in any way. None of the opinions relied upon by White convince this Court that simply zooming in on a video and capturing a still image from it—a process any juror would likely understand in this day and age—would result in an "enhanced" or "altered" image requiring expert testimony that explains step-by-step how the image came to be.

In *Gosser,* the only precedent White offers from Kentucky's jurisprudence, this Court addressed two different categories of evidence. 31 S.W.3d at 900. The first was "photographs of the crime scene in which the police had planted colored flags and had made spray-painted marks to show the locations of individuals and evidence at the time of the shooting" while the second were computer-generated diagrams of the crime scene. *Id.* The evidence at issue in *Gosser* is therefore clearly distinguishable from the photographs in this case as the photographs of White are not an after the fact recreation of the crime scene made by law enforcement either through a photograph or a computer program. Rather, they are images pulled from footage of the crimes as they occurred in real-time.

The two federal circuit cases cited by White likewise provide no support for his contention that the photographs at issue were "enhanced." *Roberts* involved seven still photographs taken from video footage that a forensic audio-

10

video analyst "had applied minor filters to. . .to sharpen and brighten them before enlarging certain regions in the images by 300%."  84 F.4th at 666. Similarly, *Seifert* concerned a surveillance video tape that was "digitally enhanced" by Jack Hunter, an expert in electronic surveillance and video analysis, as follows:

> Because the original video is "time lapsed"-slower than normal speed-Hunter "real-timed" the enhanced copy.  Hunter also explained that the original video is a "quad image," with the screen divided into quarters to depict images from four cameras.  Hunter enlarged the video from the relevant camera, discarding the output from the three irrelevant ones.  Finally, because the original image is dark, Hunter brightened it, additionally brightening the suspect and the surrounding area more than the rest of the image.

445 F.3d at 1045.

The cases White relies upon from our sister states are also clearly distinguishable.  In *Dolan,* a forensic video analyst made the images from a VHS tape "bigger, brighter, and better" via the following process:

> The process began with identifying the best video recording machine for playback, playing the tape on that machine, and transferring the image electronically to computer as a digital image. . . Next, the most relevant frames of the video images were selected, and computer software used to add, enlarge, darken or lighten pixels in the now-digitized picture in order to clarify and focus the image.  Once each image was computer-enhanced, still prints were made.

743 So.2d at 545.  *Nooner* addressed a VHS tape from which still photographs were made using several private firms as follows:

> Rupert Robertson, a video specialist for Arkansas Power & Light Company, testified that he slowed the original videotape down by making an exact duplicate of it in the Betacam format and then freezing each frame for several seconds.  Tom Burney of Jones Productions testified that he took a still frame from the duplicate videotape, transferred it to his computer, and softened the pixels

11

> on the suspect's face to remove the graininess. . . Tillery of Color Masters testified that he took the computer disk prepared by Tom Burney and made still photographs. He multiplied the pixels per square inch to improve the contrast and adjusted the brightness in one of the still photographs. He also testified that he in no way altered the features in the photographs. Jeff Bishop from Camera Mart testified that he made still photographs from the original videotape. He only adjusted the brightness in the photographs.

907 S.W.2d at 686. Finally, in *English*, certain frames from a videotape were "subjected to computer enhancement" by a technician. 422 S.E.2d at 925.

In this case, the video of White was not enhanced or altered in any way to obtain the photographs. Indeed, from this Court's review of the evidence, the quality of the surveillance footage greatly exceeds the quality of the still photographs, which are blurrier due to the effect of "zooming in." Meaning the jury would have gotten a much clearer look at the clothes the suspect in the footage wore via the unobjected to surveillance video than the photographs. The *Roberts* standard for admissibility accordingly has no application in this case.

Nevertheless, that still leaves us with the question of whether the photographs were otherwise properly authenticated given that neither Det. Hammock nor the Simmons College employee that provided the video and still photographs testified at trial. This Court reviews a trial court's finding of authentication for abuse of discretion. *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004). We will accordingly affirm the trial court's ruling unless we conclude that it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). As always, the touchstone for authentication is KRE 901(a) which

12

states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence to support a finding that the matter in question is that its proponent claims."

> This rule treats preliminary questions of authentication and identification as matters of conditional relevance according to the standards of [FRE][6] 104(b).  The condition of fact which must be fulfilled by every offer of real proof is whether the evidence is what
>
> its proponent claims.  The proponent's burden of authentication is slight, which requires only a prima facie showing of authenticity to the trial court.

*Johnson,* 134 S.W.3d at 566 (internal citations and quotation marks omitted). KRE 901 goes on to say that "the following are examples of authentication or identification conforming with the requirements of this rule: Testimony of a witness with knowledge.  Testimony that a matter is what it is claimed to be." KRE 901(b)(1).

Here, the circuit court did not abuse its discretion by determining that the still photographs were properly authenticated through Det. Conley.  The exhibits in question were zoomed in still photographs from a video that had already been authenticated, admitted into evidence, and played twice.  The photographs themselves clearly demonstrate that they were taken from the surveillance video.  Moreover, Det. Conley had personal knowledge of what the photographs were and what they depicted because they were the same photographs that were used in the investigation for which he was the lead detective.

---

[6] Federal Rules of Evidence.

Even assuming for the sake of argument that the circuit court did err, the error would have been harmless. *See* RCr[7] 9.24. The photographs' sole evidentiary value was to demonstrate what the suspect was wearing at the time of the carjacking and, again, that information had already been established by the admission of the surveillance video. White's substantial rights would therefore not have been affected by the admission of the photographs and we affirm.

## B. The circuit court did not err by allowing the jury to see body camera footage of White in handcuffs.

White next asserts that the circuit court violated his right to a fair trial by allowing the jury to see four clips of body camera footage depicting White in handcuffs while he was detained. U.S. Const. amend. XIV; Ky. Const. § 11.

In relevant part, the Commonwealth played four different clips from Sgt. Hurley's body camera footage. The first clip depicted officers ordering the occupants of 2303 Magazine Street out of the residence upon their arrival and showed Sgt. Hurley placing White in handcuffs, telling him that he was not under arrest, and telling him that he was being detained. By this Court's count, Sgt. Hurley told White that he was not under arrest five different times in the first clip. The footage then showed Sgt. Hurley placing White's brother in cuffs, telling him that he was being detained, and telling him that he was not under arrest at least four times.

---

[7] Kentucky Rule of Criminal Procedure.

14

The subsequent three clips captured each of the three times White called Sgt. Hurley over to ask him what was going on. Each time, White is shown with his hands still cuffed behind his back. During the first clip Sgt. Hurley explained to White that they placed him in cuffs because they did not know if he was involved in the carjacking or not and the officer again told White that he is not under arrest. During the second clip, Sgt. Hurley told White that the officers intended to leave if the detectives concluded no one in the house was involved.

At trial, defense counsel objected as soon as the portion of the first clip that showed White being handcuffed upon exiting the residence was played. Counsel argued that showing White handcuffed was unduly prejudicial. The Commonwealth responded that the officer clearly says in the footage that White is not under arrest and that he was being detained. The Commonwealth further highlighted that White was not being singled out by the police because his brother was also placed in cuffs and told he was not under arrest. The circuit court agreed that the footage was not unduly prejudicial and overruled the objection with instructions to the Commonwealth to ask Sgt. Hurley why White and his brother were placed in handcuffs. Defense counsel did not request an admonition to the jury and the circuit court did not provide one *sua sponte*. When questioning resumed, the Commonwealth asked Sgt. Hurley why White and his brother were placed in handcuffs if they were not under arrest. The officer responded that the crime they were investigating was an armed carjacking and further explained that "when there's a possible gun in play and

15

we don't know who the suspect may be we want to detain them so that everyone else is safe." He agreed with the Commonwealth's characterization of the practice as "an officer safety issue."

Before this Court, White argues under *Deal v. Commonwealth*, 607 S.W.3d 652 (Ky. 2020) that playing the clips of Sgt. Hurley's body camera footage of him in handcuffs violated his constitutional right to a fair trial. This Court reviews a trial court's ruling on the admission of evidence for abuse of discretion. *See, e.g., Meece v. Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011). The test for abuse of discretion asks whether the trial court's ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. Ordinarily, an error in ruling on the admissibility of evidence is subject to harmless error review under RCr 9.24 and therefore may not be a basis to reverse or vacate a conviction unless this Court cannot "say with fair assurance that the judgment was not substantially swayed by the error." *Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky. 2013); RCr 9.24.

> But when the evidentiary ruling is found to be erroneous because it violated a defendant's constitutional rights, the error is still subject to harmless error review *but* the error may be used as basis to reverse or vacate a judgment if we cannot say the error was harmless beyond a reasonable doubt.

*Deal*, 607 S.W.3d at 658. The test for whether an error was harmless beyond a reasonable doubt "is not simply whether there was sufficient evidence to support the conviction aside from the improper evidence." *Staples v. Commonwealth*, 454 S.W.3d 803, 827 (Ky. 2014). Rather, it is "whether the improper evidence was of a weight, was of a striking enough nature, or played a

16

prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction." *Id.*

In *Deal*, the Commonwealth was permitted to play at trial the entirety of a thirty-five-minute video of the defendant being questioned, with counsel present, by an Assistant Commonwealth's Attorney and the lead detective. 607 S.W.3d at 656. The interview occurred after the defendant had been arrested and took place at the jail where the defendant was being housed prior to trial. *Id.* Throughout the interview, the defendant was handcuffed and wearing an orange inmate jumpsuit. *Id.*

The *Deal* Court first engaged with a thorough discussion of both our own jurisprudence[8] and that of the United States Supreme Court on the issue of a defendant appearing before a jury in "the badges of custody," i.e., prison or jail attire, handcuffs, leg shackles, and the like. *Id.* at 658-63. This Court found fault with Kentucky's existing jurisprudence on the subject as it did not sufficiently engage with discussion of on point United State Supreme Court precedents such as *Estelle v. Williams*, 425 U.S. 501 (1976), *Holbrook v. Flynn*, 475 U.S. 560 (1986), and *Deck v. Missouri*, 544 U.S. 622 (2005). The *Deal* Court accordingly laid out for the first time the required analysis when "a

---

[8] Specifically, *Estep v. Commonwealth*, 663 S.W.2d 213, 216 (Ky. 1983) (holding the introduction of a photograph of the defendant in handcuffs at the time of his arrest was not reversible error); *Shegog v. Commonwealth*, 142 S.W.3d 101, 109 (Ky. 2004) (holding that several potential jurors inadvertently seeing the defendant in handcuffs while being transported from the jail to the courthouse did not result in prejudice to the defendant); and *Bryan v. Commonwealth*, 2015-SC-000467-MR, 2017 WL 1102825 (Ky. Mar. 23, 2017) (holding that playing a police interview of defendant wearing a jumpsuit and handcuffs was not an abuse of discretion and in the alternative was harmless error). *Deal*, 607 S.W.3d at 661-63.

17

defendant challenges a trial event claiming the event undermines the jury's ability to decide the case fairly." 607 S.W.3d at 663. The analysis was stated as follows:

> when a defendant objects to a specific trial event, the trial court, in the exercise of its discretion, has a responsibility under the Fourteenth Amendment to consider whether the practice is "inherently prejudicial." . . . [A] practice is generally found to be "inherently prejudicial" when it threatens the fairness of the factfinding process by undermining the defendant's right to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.
>
> In carrying out this responsibility, the trial court must engage in a thorough analysis and "closely" consider any factors relevant in the
>
> specific case, including: the likelihood that the challenged event could be interpreted by the jury as indicating that the defendant has already been adjudged to be particularly dangerous or culpable; the reasoning behind other courts' decisions when faced with similar cases; and the likelihood that the event would normally operate to the disadvantage only to those defendants who are unable to post bond to be released pending trial.

*Id.* at 663–64 (internal footnotes and quotation marks omitted). If the trial court finds that that the challenged event is inherently prejudicial or is prejudicial based on the particular circumstances of the case, it may only "allow the proposed event if it finds that the event is nonetheless justified by some identifiable and essential state interest."[9] *Id.* at 664. In cases where a

---

[9] The *Deal* Court expounded that to determine whether the challenged event is justified by a state interest, the trial court may consider factors such as: "(1) the merits of the asserted state interest; (2) the potential threat posed by the challenged event to the defendant's constitutional rights; and (3) the availability of alternatives that could minimize the risk posed to the defendant's rights while still acting to serve the asserted state interest." *Id.* at 664-665 (internal footnotes omitted).

trial event is inherently prejudicial and does not serve an essential state interest prejudice will be presumed for the purposes of appellate review and a defendant is entitled to reversal of his or her conviction unless the Commonwealth can show beyond a reasonable doubt that the defendant was not prejudiced by the challenged event. *Id.* at 665.

The Court went on to discuss that such a standard had been applied in cases where a jury viewed the defendant in "badges of custody" either in person or in a photograph, but neither it nor the United States Supreme Court had considered a videotaped presentation of the same. *Id.* at 666. It relied upon a Tennessee Supreme Court opinion that had addressed the issue, *State v. Taylor*, 240 S.W.3d 789 (Tenn. 2007), for guidance. 607 S.W.3d at 666.

*Taylor* addressed whether the defendant's constitutional rights were violated by the admission of a video of the defendant in custody and dressed in jail clothing that was recorded while the State was working with a jail informant. *Id.* The Tennessee Supreme Court held that "the trial court did not err in admitting the video because it did not result in a violation of the defendant's constitutional rights." *Id.* The *Taylor* Court found it significant that the defendant was not tried dressed in jail attire; the video depicting the defendant in jail attire was brief; the video was not the source of the potential prejudice arising from the jury discovering that the defendant was in jail, as the informant had already provided testimony to that effect; and because the trial took place over three days while the video was only seven minutes long. *Id.*

The *Deal* Court explicitly stated it did not disagree with the *Taylor* Court's conclusion that "admitting evidence depicting a defendant in jail custody is not 'inherently prejudicial' under all circumstances." *Id.* at 667. Nevertheless, this Court went on to state that

> [c]ommon sense suggests that the impact of allowing a brief videotaped presentation to the jury depicting the defendant in jail attire or shackles is not as damaging as requiring a defendant to appear that way in person before the jury. But we remain convinced that videos of the defendant "bearing badges of custody" pose a threat to the defendant's right to a fair trial because it tends to suggest to the jury that some official determination has already been made that the defendant needs to be restrained and separated from society. This is especially true when, as in Deal's case, the jury was able to see and hear testimony to the effect that the jail interview was recorded months after the defendant was arrested on the underlying charges.

*Id.* It then noted that the facts of *Taylor* were distinguishable because unlike the defendant in *Taylor*, Deal was wearing both jail clothing and shackles in the video, the video was thirty-five minutes long as opposed to seven, and the video was recorded two months after Deal was arrested as demonstrated by the video's prominent time stamp. *Id.* at 667-68. The Court concluded by holding that "while **not** 'inherently prejudicial,' the video prejudiced Deal" based on the specific facts of the case, and the trial court failed to determine whether the prejudicial nature of the video was justified by an essential state interest or if the prejudice could be minimized by an available alternative. *Id.* at 669 (emphasis added). And, as the Commonwealth failed to prove the error was harmless beyond a reasonable doubt, the Court reversed Deal's convictions and remanded for a new trial. *Id.* at 668-69.

Based on the foregoing, we hold that the circuit court did not abuse its discretion by admitting the body camera clips of White and that his constitutional right to a fair trial was not violated. As a threshold matter, it was made abundantly clear through both the footage itself and Sgt. Hurley's testimony that White, although handcuffed, *was not in police custody*. Sgt. Hurley clearly stated to White at least six times across the four clips that he was not under arrest and that he was only being detained while the officers investigated. In that vein, in both the clips and the testimony elicited at the direction of the circuit court, Sgt. Hurley explained that the only reason White was being detained was that the officers *did not know* if he was involved in the carjacking or not. Sgt. Hurley's interactions with White throughout the clips was calm, professional, and cordial. There was accordingly no basis to conclude that it had been suggested to the jury that an official determination had been made that White was guilty of the alleged crimes or that he was otherwise dangerous and needed to be restrained and separated from society. *Id.* at 667.

In addition, and as argued before the circuit court, White was not "singled out" by the officers for detainment. In the footage both he and his brother were handcuffed, and his brother was likewise told numerous times that he was not under arrest. Finally, the clips constituted mere minutes of evidence within the context of a four-day trial. In the first clip, approximately one-minute passes between Sgt. Hurley handcuffing White and Sgt. Hurley walking away from him after he sits him down on the stoop of the house next

21

door; the second clip is a total of fifty-four seconds; the third clip is a total of twenty-six seconds; and the final clip is a total of twenty-one seconds.

Accordingly, as the trial court's finding that the body camera footage was neither inherently prejudicial nor prejudicial under the particular facts of the case, *Deal*, 607 S.W.3d at 664, was not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles[,]" *English*, 993 S.W.2d at 945, we affirm.

## C. White waived his ability to argue that KRS[10] 509.050, the kidnapping exemption statute, precluded him from being convicted of kidnapping.

For his final assertion of error, White claims that KRS 509.050 should have prevented him from being prosecuted for the offense of kidnapping. That statute, colloquially known as the kidnapping exemption statute, directs that "A person may not be convicted of . . . kidnapping" when each prong of the following three-part test is satisfied:

> First, the underlying criminal purpose must be the commission of a crime defined outside of KRS [Chapter] 509. Second, the interference with the victim's liberty must have occurred immediately with or incidental to the commission of the underlying intended crime. Third, the interference with the victim's liberty must not exceed that which is ordinarily incident to the commission of the underlying crime.

*Stinnett v. Commonwealth*, 364 S.W.3d 70, 76–77 (Ky. 2011) (quoting *Hatfield v. Commonwealth*, 250 S.W.3d 590, 599 (Ky. 2008)); KRS 509.050. White concedes this argument was not preserved for this Court's review but requests palpable error review pursuant to RCr 10.26. We decline to do so.

---

[10] Kentucky Revised Statute.

22

For decades, this Court has held steadfast to the tenet that if a defendant requests a jury instruction before the trial court, he or she may not complain on appeal that the instruction was given in error. *See, e.g., Rudd v. Commonwealth*, 584 S.W.3d 742, 746 (Ky. 2019) (holding "Rudd affirmatively proposed the instruction that contained the very defect he now opposes, and thus, invited the error. . . Invited errors amount to a waiver and are not subject to appellate review.") (cleaned up); *St. Clair v. Commonwealth*, 451 S.W.3d 597, 642 (Ky. 2014) (holding "St. Clair cannot claim he was prejudiced by the giving of an instruction that he requested."); *Webster v. Commonwealth*, 438 S.W.3d 321, 324 (Ky. 2014) (holding "[W]hen an appellant affirmatively proposes an instruction that contains the very defect he now opposes, that appellant invites error. Invited errors amount to a waiver and are not subject to appellate review.") (cleaned up); *Thornton v. Commonwealth*, 421 S.W.3d 372, 376-77 (Ky. 2013) (holding "[I]f the instruction given was actually erroneous, Appellant not only failed to preserve the error by making the concern known to the trial court, he invited the error by affirmatively proposing an instruction that contains the very defect he now opposes."); *Commonwealth v. Southwood*, 623 S.W.2d 897, 897-98 (Ky. 1981) (holding "It is still the law that an objection must be made in order to preserve an error in the instructions."); *Mason v. Commonwealth*, 565 S.W.2d 140, 140 (Ky. 1978) (holding "[T]he insanity instruction offered by the defense was identical to that given by the trial court. Having requested the instruction Mason is now precluded from complaining of its content.").

Here, White's requested jury instructions included an instruction for kidnapping that was substantially similar to the instruction ultimately given to the jury.[11]  *See Webster*, 438 S.W.3d at 324.  He is accordingly precluded from arguing on appeal that the circuit court erred by instructing the jury on kidnapping pursuant to KRS 509.050.

## III.   CONCLUSION

Based on the foregoing, we affirm.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Christopher Barrett Thurman
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Stephanie Lynne McKeehan
Assistant Attorney General

---

[11] White's requested instruction proceeded under the theory that White's intent in unlawfully restraining Keisha was to either "inflict bodily injury or to terrorize her." *See* KRS 509.040(1)(c).  The jury instruction the circuit court provided proceeded under the theory that White's purpose in unlawfully restraining Keisha was "[t]o accomplish or advance the commission of Robbery in the First Degree" or "to terrorize Keisha[.]"  *See* KRS 509.040(1)(b),(c).